UNITED STATES of America, Plaintiff–Appellee,

v.

Miguel ALVAREZ–VALENZUELA, Defendant–Appellant.

No. 99–10374.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 2, 2000

Filed Nov. 8, 2000

Michael P. Simon, Assistant Federal Public Defender, and Brian I. Rademacher, Office of the Federal Public Defender, Tucson, Arizona, for the defendant-appellant.

Robert Miskell and Christina M. Cabanillas, Assistant U.S. Attorneys, Appellate

**1200**

Section, Tucson, Arizona, for the plaintiff-appellee.

Before: WOOD, Jr.,[1] KLEINFELD, and GRABER, Circuit Judges.

Opinion by Judge HARLINGTON, Jr.; Dissent by Judge KLEINFELD.

WOOD, Circuit Judge:

In June 1999 the grand jury returned an indictment charging defendant-appellant Miguel Alvarez–Valenzuela ("Alvarez") and two co-defendants with conspiracy to import marijuana; importation of marijuana; conspiracy to possess marijuana with intent to distribute; and use, carrying, or possession of a gun in relation to a drug-trafficking crime.[2] Alvarez and his co-defendants were arrested on January 29, 1999 by Border Patrol agents in the desert near Douglas, Arizona about two miles north of the United States–Mexico border. At the time of their arrest, the men were carrying eighty-three pounds of marijuana. Agents also discovered a .380 caliber pistol on the ground near the three men. In May 1999, Alvarez and co-defendant Francisco Martines–Renteria ("Martines") were found guilty by a jury on all counts, but only the firearms charge was seriously contested. The third co-defendant, Rodolfo Bejarano–Ponce ("Bejarano"), pled guilty to all five counts pursuant to a plea agreement and testified as a government witness against Alvarez and Martines. Only Alvarez is involved in this appeal.[3] No issue except the gun issue is raised. Alvarez first challenges the sufficiency of the evidence to support the firearms conviction and, second, the district court's response to a jury question regarding a jury instruction based on *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

As we begin a review of the first challenge, it would be helpful to resolve our standard of review, which is disputed. Alvarez made a motion to dismiss at the end of the government's case, which the district court denied. His motion was not renewed at the end of trial. The motion was not identified as a motion for judgment of acquittal under Fed.R.Crim.P. 29(a), but the parties have treated it as one. In this situation of non-renewal the government argues that Alvarez has effectively waived his objection, relying on *United States v. Kuball*, 976 F.2d 529, 531 (9th Cir.1992). Alvarez relies on *United States v. Garcia–Guizar*, 160 F.3d 511, 516–17 (9th Cir.1998), and related cases to support his argument that a *de novo* standard of review applies.

Motions for acquittal are made pursuant to Rule 29(a), so we shall examine the rule first, but it is of little help in this situation. It provides in relevant part that a judgment of acquittal may be entered after the evidence on either side is closed if the evidence is insufficient to sustain a conviction. The rule does not mention any requirement that a motion made by a defendant at the close of the government's evidence must be renewed at the close of all the evidence or, if not, what effect non-renewal may have on the standard of review.

■ After reviewing the cases cited by both parties, we interpret Rule 29(a) to suggest that failure to renew the motion at the end of trial does not mean that it has been waived, but only that a higher standard of review is to be imposed. This

1. The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

2. The defendants were each charged with violations of 21 U.S.C. §§ 963, 952(a), 846, and 841(a)(1), and 18 U.S.C. § 924(c).

3. On July 23, 1999, the court sentenced Alvarez to four concurrent terms of a year and a day for the drug trafficking counts and a consecutive 60–month imprisonment term for the firearms count, plus 36 months of supervised release and a special assessment of $500.00.

court may review an unrenewed motion for judgment of acquittal, but only to prevent a manifest miscarriage of justice, or for plain error. *See United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1010 (9th Cir. 1995); *see also Garcia–Guizar,* 160 F.3d at 516. The cases of both parties support that interpretation, but the difficulty is in its application, as noted in *Vizcarra–Martinez,* 66 F.3d at 1010. The court would be reluctant to sustain a conviction if it could be clearly seen from the record that the evidence was insufficient. *See id.* at 1010. However, even in a case in which the defendant has made all the proper motions, this court will not reverse in the absence of a clear showing of insufficiency. *See id.* If any rational trier of fact could have found the evidence sufficient, we must affirm. *See id.* The court in *Vizcarra–Martinez* could not envision a case "in which the result would be different because of the application of one rather than the other of the standards of review." *Id.* That court escaped having to determine whether there may be any practical difference between the two standards because it found that the usual standard, which is applied when all appropriate motions are made, had been satisfied. *See id.*

There is another aspect of the non-renewal of the motion for acquittal raised by Alvarez. He claims, relying on *United States v. Palmer,* 3 F.3d 300, 304 (9th Cir.1993), and *United States v. Pennington,* 20 F.3d 593, 597 n. 2 (5th Cir.1994), that if the record suggests that at the time the original motion was denied it would be futile to raise it again, it need not be renewed. The government points out that *Palmer* is inapposite because it concerned a party's failure to renew a pretrial motion under an evidentiary rule. We turn then to the Fifth Circuit's decision in *Pennington,* a sufficiency-of-the-evidence case in which the defendants did not renew their motions for acquittal at the close of all the evidence. The Fifth Circuit held that the defendants had adequately preserved their objection despite the fact that their motions for acquittal were not renewed at the conclusion of the defense evidence, because

the actions of the district court rendered the renewal of the motions an empty ritual. *See Pennington,* 20 F.3d at 597 n. 2.

The record in the present case reveals that, at the close of the government's case, there was actually no motion made for acquittal on the basis of insufficiency of the evidence, only a perfunctory "motion to dismiss generally" made by counsel for Martines. Counsel for Alvarez joined the motion of the other counsel. Neither counsel advanced any argument on behalf of the motion.

In view of the perfunctory motion and its non-renewal, the district court was given little help. In this court, the arguments have been extensive, but the district court, not having the benefit of those arguments, leaves no record of its reasoning in denying the motion. As did the court in *Vizcarra–Martinez,* 66 F.3d at 1010, we will leave for another day any difference that there may be in the two standards of review. When ruling on the motion, the district judge stated, "I'll deny the motions, which preserves them anyway," suggesting that renewal would be unnecessary. Following this comment, the defense presented its evidence, which consisted solely of Alvarez's brief testimony in his own defense. In any event, because we conclude that there is adequate evidence to support Alvarez's conviction under the usual standard, our analysis is unaffected by any practical difference between the standards.

■ In reviewing the sufficiency of the evidence, there are certain ground rules that both parties acknowledge. The evidence is to be considered in the light most favorable to the government to determine whether any rational, trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See id.* at 1009–10 (internal quotations and citations omitted). Further, all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the

jury's verdict. *See United States v. Lay-kin,* 886 F.2d 1534,1539 (9th Cir.1989).

■■■ The parties agree that the verdict against Alvarez on the firearms charge is based on a *Pinkerton* theory of liability. *See Pinkerton,* 328 U.S. at 647–48, 66 S.Ct. 1180 (holding that a defendant could be held liable for a substantive offense committed by a co-conspirator as long as the offense occurred within the course of the conspiracy, was within the scope of the agreement, and could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement). Alvarez argues that an erroneous view of *Pinkerton* liability was put before the jury by the government during trial and in the *Pinkerton* instruction given by the district court, erroneously turning the *Pinkerton* doctrine into a rule of strict liability. As part of his argument, Alvarez points to a question from the jury during deliberation as evidence of what he believes to be the jury's "total confusion and misunderstanding of the correct rule of law." During deliberation, the jury sent a note to the judge asking, "If one member of the conspiracy knowingly possesses a gun, are all members of the conspiracy guilty. [sic] This refers to the Pinkerton Charge item 5 beginning on line 18."

The judge, after a conference with all counsel, advised the jury as follows:

Now, I can't be a great deal of help to you … except to tell you to read the *Pinkerton* charge, keeping in mind, as the charge says, the government has to prove each of the five elements. *It can't prove one, or two, or three, or four, it's got to prove all five elements beyond a reasonable doubt. Each one of the five.* So you've got those five elements of the *Pinkerton* charge. If you find the government's proven each of those elements beyond a reasonable doubt, then you find guilt. *If you find that any one of those elements has not been proven beyond a reasonable doubt, you don't. That's about all I can say to you. That's what the Pinkerton* charge is. I can't really elaborate on it, because the ground rules prevent me from elaborating on charging you on the law, so go back to work with that little help, or no help, and do the best you can.

(Emphasis added).

That was an adequate response to the jury's question and avoided the possible error sometimes found in trying to elaborate on a given instruction. The jury was sent back and instructed to read again the original instruction. There is no reason to believe that the jury did not read it again, and follow it, before returning its verdict. The defendant now argues that the district court should have informed the jury only that the answer was "no." That suggestion, however, was not made to the district court at the time. Defense counsel's only suggestion at the time was: "Just tell them to consider the instructions." That is what the district court did. It is too late for the defense to complain now.

■■■ Alvarez further argues that the *Pinkerton* instruction as given by the district court contained an erroneous view of the law. The instruction given was as follows:

Each member of a conspiracy is responsible for the actions of the other members performed during the course and in furtherance of the conspiracy. If one member of the conspiracy commits a crime in furtherance of the conspiracy, the other members have also, under the law, committed that crime. Therefore, you may find a defendant guilty of possession of a firearm during and in relation to a drug trafficking crime, as charged in Count 1 or in Count 3 of the Indictment, if the government has proven each of the following elements beyond a reasonable doubt:

First, a person involved in the conspiracy in Count 1 or Count 3 knowingly possessed a firearm during and in relation to a drug trafficking crime;

Second, the person was a member of the conspiracy charged in Count 1 or Count 3;

Third, the person possessed the firearm in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time that the offense charged in either Count 1 or Count 3 was committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Alvarez contends that, although the instruction subsequently states that the government had to prove all five elements, the opening part of the "instruction impermissibly turned the burden of proof on its head and told the jury that the defendants were guilty of the substantive firearm offense solely if they were part of a conspiracy in which another co-conspirator possessed a gun." First, it should be noted that the defense did not object to the instruction when it was given, although it does in this court. Therefore, our review is only for plain error. *See Garcia–Guizar*, 160 F.3d at 522–23. The instruction as given incorporates text from the Ninth Circuit Manual of Model Jury Instructions, Criminal, § 8.5.5 (1997), and stresses the necessity of finding all five elements beyond a reasonable doubt. The instruction contains an accurate statement of the applicable law, and Alvarez fails to show plain error.

■ The bulk of Alvarez's argument focuses on the sufficiency of the evidence. Here Alvarez argues that there was no evidence to support a finding that the presence of a gun during the group's transport of the marijuana across the border was reasonably foreseeable to him or within the scope of his agreement. Alvarez claims that the jury's verdict could be based only on speculation and not on evidence, and that speculation alone is not sufficient to support a conviction, citing *United States v. Andrews*, 75 F.3d 552, 556 (9th Cir.1996).

■ Alvarez ignores some pertinent evidence, as well as the general rules that the evidence is to be viewed in the light most favorable to the government and that all reasonable inferences are to be drawn in favor of the government. Alvarez would turn the case on the fact that there was no evidence that he personally possessed the gun. It is true that there is no evidence that he ever held the gun, but in the conspiracy context that is not controlling. The government need not establish even actual knowledge of the gun to sustain the conviction. *See United States v. Castaneda*, 9 F.3d 761, 768 (9th Cir.1993) (*"Pinkerton* does not require actual knowledge as to the *weapons"* (emphasis in original)). From the evidence presented, a reasonable jury could have found that Alvarez could reasonably have foreseen the use of the firearm. *See id.*

There is clear evidence of a conspiracy and evidence that the illegal importation of marijuana for profit was the object of that conspiracy; indeed, these facts are conceded. In regard to the gun issue, there is evidence suggesting that Alvarez had actual knowledge that one of the three of them would have a gun, and why. The duration of the conspiracy was only from January 28 to January 29, 1999. Alvarez testified that he had lived all his life in Agua Prieta, a small Mexican town on the Arizona–Mexico border. He and Bejarano had been friends in Agua Prieta and played basketball together in the local park in the afternoons. On January 28, Alvarez was passing by Bejarano's house when Bejarano invited him to go on this foray to help carry marijuana into the United States. Bejarano said Alvarez would be paid for the service. Alvarez agreed. Alvarez returned to Bejarano's house later that day. At about 7:00 or 7:30 that evening, the men were picked up and taken to where the bundles of marijuana were ready to go. Alvarez knew their destination was the United States, where the marijuana would be dropped off next to a fast food restaurant. Alvarez estimated that the men crossed the border around 9:00 or 10:00 p.m.

Bejarano testified that he knew the area they would traverse, as he had often escorted undocumented Mexican aliens into the United States along that route. For this trip he described himself as the guide for the two other co-conspirators. He had been selected for this mission by another person whose name he did not know. Bejarano then described what happened as the group assembled before leaving Mexico to cross the border. Present were the stranger, Bejarano, and the two other conspirators. The stranger was later referred to as "El Chore," although that was not his real name. El Chore had the gun and handed it to Martines, who placed it in his waistband. Bejarano testified that the exchange of the gun took place at nighttime, before the men crossed into the United States. Bejarano explained that they took the gun along for defense purposes on the United States side of the border. At the time they were stopped by Border Patrol agents, Bejarano testified that the men had traveled three miles into Arizona and that it had taken them two-and-a-half hours to do so.

A Customs Service agent testified that guns and drugs go together, but that guns are not generally found with those seeking only illegal entry into this country. The reason is the high value of marijuana, the price of which ranges from $50 a pound in the fields in Mexico to $150 a pound in Agua Prieta to $450 to $750 a pound in Tucson, to $1,000 a pound in Los Angeles and even higher in Chicago and New York. The conspirators in the present case were carrying a total of eighty-three pounds of marijuana. Although it is unclear whether Alvarez knew how much marijuana was to be transported at the time he agreed to accompany Bejarano, clearly at the time they were loading up to cross the border, Alvarez could tell that there was a substantial amount of marijuana involved. Both the value of this marijuana and the nature of violence in the drug trade support an inference that Alvarez could have foreseen that a gun might be present.

The Border Patrol agents who arrested the men also testified. They stated that they apprehended the men at approximately midnight and seized the firearm in question. The particular weapon carried was described as a chrome-plated Lorcin .380 automatic pistol and was fully loaded when discovered by the agents. The agents considered it extremely dangerous, particularly when not carried in a holster, because it had a very sensitive trigger and a poor safety lock. This gun was not holstered for the border crossing, but only stuck in the waistband of Martines's pants, a very dangerous way to carry it. From this evidence, the jury could reasonably infer that the gun was visible to Alvarez. It would have been difficult for Martines to travel the several miles they did in crossing the border without having to adjust this particular kind of gun to keep it from falling out of his belt or rubbing on his body. When the arresting agents were closing in, Martines dropped the gun purposely between the feet of Alvarez and Bejarano, only a few inches from either, where it was hidden by tumbleweed.

Alvarez testified only briefly in his own defense, stating that he did not know that anyone in the group was carrying a gun until federal agents appeared. He was twenty-one years of age at the time and testified that he had had no experience with guns. On cross-examination, he testified that he knew that there was a lot of alien-smuggling and a lot of trafficking in marijuana all along the border. When asked if the border was sometimes a dangerous place, he responded, "It is in fact dangerous." Alvarez admitted that, if an individual had valuable property, the border area would be a dangerous place, especially at night, because of the risk that someone might try to take the property from him. That was about the extent of the defense case, and no further evidence was offered by the parties.

It is important to note that, given Bejarano's testimony together with Alvarez's estimates of timing, the evidence supports a finding that all three men were present when El Chore handed the gun to Mar-

tines before the journey was to begin. A jury reasonably could infer that Alvarez was not oblivious to this gun arrangement for what he considered would be a dangerous journey. There is not the slightest hint in the evidence that the transfer of the gun was secret, or not openly done, to keep Alvarez from knowing what was happening. The three men were all in it together. There was no need to keep the presence of a gun a secret from Alvarez. The fact that Alvarez did not handle the gun is irrelevant. Given the evidence as a whole, a jury reasonably could have concluded that Alvarez had actual knowledge that there was a gun along for their mutual protection or, at least, that it was foreseeable to Alvarez that a gun would be present during the conspirators' marijuana mission.

We AFFIRM Alvarez's conviction.[4]

KLEINFELD, Circuit Judge, dissenting:

I agree with all of the majority's well-analyzed opinion, except on the issue of whether Alvarez–Valenzuela is responsible for the gun. As is common in gun cases, the gun charge matters more, five years as compared to one year of prison time, than the underlying crime. The jury's question about the conspiracy instruction shows that the jurors had a serious concern about the extent of vicarious liability for a coconspirator's gun. And the evidence just was not enough to satisfy a reasonable juror, beyond a reasonable doubt, that Alvarez–Valenzuela knew about the gun or could reasonably foresee it.

Of course like any ordinary reader, I imagine that drug smugglers carry and shoot guns all the time. After all, that is how the movies and television portray them. But this imagined script cannot be substituted for evidence. Neither we nor, I would guess, the scriptwriters, have any personal experience with drug smuggling.

They are making it up, and we have a stereotype based on what they have invented. We held in *United States v. Castaneda*[1] that *Pinkerton*[2] liability could not necessarily support a gun conviction in a drug conspiracy, because "there is no presumption of foreseeability" of a gun.[3]

So let's look at the evidence. First, if there was evidence that the marijuana smugglers in that area routinely carry guns, that would have some persuasive force for the proposition that Alvarez–Valenzuela should have foreseen that one of his coconspirators would also be carrying one. But, surprisingly to one not experienced in the drug smuggling business, the evidence was otherwise. The border patrol agent who found the gun testified that in his year and three months on the smuggler beat along the Arizona border, "this was the first weapon that I found as a border patrol agent." He went further and testified that the adrenaline produced by this unusually dangerous occurrence of finding a gun was the reason he remembered this particular arrest. That uncontradicted testimony would require a jury to have a reasonable doubt about the inference "of course there would be a gun." If the gun was a surprise to the border patrol agent, a reasonable juror would infer that it might be a surprise to Alvarez–Valenzuela.

El Chore gave the gun to Martines–Renteria. But, the evidence would not allow a jury to infer beyond a reasonable doubt that Alvarez–Valenzuela was there at the time. The government's cooperating witness, coconspirator Bejarano–Ponce, testified that some hours before they crossed the border El Chore handed the gun to Martines–Renteria, and Martines–Renteria put it in the waistband of his pants. The prosecutor, strikingly, did not ask Bejarano–Ponce who was present when El Chore handed Martines–Renteria

**4.** The government's motion to strike a portion of the appendix to Alvarez's reply brief is denied as moot.

**1.** 9 F.3d 761 (9th Cir.1993).

**2.** *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

**3.** *Castaneda,* 9 F.3d at 767.

the pistol. Bejarano–Ponce was entirely cooperative, so the silence on whether Alvarez–Valenzuela was present at that meeting supports, if anything, an inference that Alvarez–Valenzuela was not there.

As for whether Alvarez–Valenzuela would have seen the gun in Martines–Renteria's waistband, that seems too speculative to me for a juror to infer beyond a reasonable doubt that he could. The prosecutor did not ask his witness what the smugglers wore, or whether the gun could be seen when Martines–Renteria was carrying it. It had snowed that January day, so a reasonable inference would be that these men dressed for cool weather, not in T-shirts. The gun, a .380 Lorcin, was a trashy, lightweight, six inch long semi-automatic that would not tend to pull one's pants down or fall down one's pants, like, say, a good quality revolver. Considering the gun and the weather, a reasonable juror could not infer beyond a reasonable doubt that Alvarez–Valenzuela would have seen the gun. The weather made it likely that Martines–Renteria would be wearing a jacket or warm shirt (the weather was the only evidence elicited which would bear on what clothes were worn), and the gun could easily be concealed in one's waistband by a untucked shirt or jacket.

The majority points out correctly that there was no reason why the other conspirators would have kept the gun secret from Alvarez–Valenzuela. But there was a reason why Alvarez–Valenzuela might have been absent from the meeting where El Chore handed the gun to Martines–Renteria. If Alvarez–Valenzuela was valued by the others only for his strong back, it might be just as well for him not to recognize El Chore. Bejarano–Ponce testified that Alvarez–Valenzuela was just a mule and did not know "anything." Counsel had difficulty even drawing out the nickname "El Chore" from Bejarano–Ponce, and El Chore's real name was never revealed, so jurors could reasonably infer that El Chore did not like his identity to be widely known and that he would not

have disclosed it to a mule who had no need to know. Bejarano–Ponce testified that he, not El Chore, made the arrangements with Alvarez–Valenzuela.

These are mere disagreements about applying the law to the facts, not disagreements about what the law is. I agree with the majority on what the law is. And I agree with the majority that our test is highly permissive toward reasonable inferences against Alvarez–Valenzuela. But I just do not see how a reasonable juror could infer that Alvarez–Valenzuela had knowledge or foresaw the presence of a gun *beyond a reasonable doubt.* By analogy, we reverse conspiracy convictions for insufficient evidence, when the evidence shows no more than presence.[4] Here, there is no question that Alvarez–Valenzuela conspired to smuggle marijuana. For that charge he received only one year of prison time. The consecutive five year sentence was for Martines–Renteria's possession of the pistol. The pistol is attributable to Alvarez–Valenzuela only if it was foreseeable to him or he actually saw the gun, so it matters a great deal whether reasonable jurors could find that on the evidence they had. I do not think they could. Making it too easy to convict on a gun count without any solid evidence from which a reasonable juror could be persuaded beyond a reasonable doubt reduces the reliability of the process. People are likely to be convicted at trial for guns they really did not know about or foresee. And because of the sentencing risk on the gun counts, defendants are likely to plead guilty to crimes they did not commit in exchange for dismissals of gun counts posing a much greater sentencing risk.

4. *See United States v. Vasquez–Chan,* 978 F.2d   546, 553 (9th Cir.1992).