**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

v.

CHRISTOPHER PATRICK CRUZ,
 *Defendant-Appellant.*

No. 07-30384

D.C. No.
CR-07-00052-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
August 11, 2008—Billings, Montana

Filed February 10, 2009

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Chief Judge Kozinski

**COUNSEL**

Ryan M. Archer, Assistant United States Attorney, United States Attorney's Office for the District of Montana, Helena, Montana, for the plaintiff-appellee.

Joseph E. Thaggard, Assistant United States Attorney, United States Attorney's Office for the District of Montana, Helena, Montana, for the plaintiff-appellee.

R. Henry Branom Jr., Assistant Federal Defender, Federal Defender for the District of Montana, Great Falls, Montana, for the defendant-appellant.

---

## OPINION

REINHARDT, Circuit Judge:

At first glance, there appears to be something odd about a court of law in a diverse nation such as ours deciding whether a specific individual is or is not "an Indian."[1] Yet, given the long and complex relationship between the government of the United States and the sovereign tribal nations within its borders, the criminal jurisdiction of the federal government often turns on precisely this question — whether a particular individual "counts" as an Indian — and it is this question that we address once again today.

As our court has noted before, the law governing "[t]he exercise of criminal jurisdiction over Indians and Indian country [encompasses] a 'complex patchwork of federal, state, and tribal law,' which is better explained by history than by logic." *United States v. Bruce*, 394 F.3d 1215, 1218 (9th Cir. 2005) (quoting *Duro v. Reina*, 495 U.S. 676, 680 n.1 (1990)). From that history, and from various cases we have decided over the years, our circuit has distilled a specific test for determining whether an individual can be prosecuted by the federal government under 18 U.S.C. § 1153, a statute governing the conduct of Indians in Indian Country. We announced that test

---

[1]Although some prefer the term "Native American" or "American Indian," we use the term "Indian" throughout this opinion as that is the term employed in the statutes at issue in this appeal.

in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), a case that both parties agree controls our analysis today. Because the evidence adduced during Christopher Cruz's trial does not satisfy any of the four factors outlined in the second prong of the *Bruce* test, we hold that, even when viewed in the light most favorable to the government, his conviction cannot stand. The district court's failure to grant Cruz's motion for judgment of acquittal was plain error, and accordingly we reverse.

## I.

Cruz was born in 1987 to Roger Cruz and Clara Clarice Bird. His father is Hispanic and his mother is 29/64 Blackfeet Indian and 32/64 Blood Indian. The Blackfeet are a federally recognized tribe based in northern Montana; the Blood Indians are a Canadian tribe. Given his parents' heritage, Cruz is 29/128 Blackfeet Indian and 32/128 Blood Indian.

For a period of three or four years during his childhood, Cruz lived in the town of Browning, Montana on the Blackfeet Reservation. Between the age of seven and eight, he moved off the reservation and spent the next ten years living first with his father in Great Falls, Montana and subsequently with his uncle in Delano, California. Neither Great Falls nor Delano is located on an Indian reservation or otherwise located in Indian country.[2] In 2005, Cruz returned to Montana, living for a period of time in the town of Cut Bank, which is located just outside the boundaries of the Blackfeet Reservation. Shortly before the incident underlying this case, Cruz

---

[2]"[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151.

moved back to Browning, where he rented a room at the Town Motel.

On December 21, 2006, Cruz and a group of friends spent a part of the evening drinking in his room at the Town Motel. While standing outside the motel talking on a cordless phone to his girlfriend, Cruz was approached by Eudelma White Grass, who had been drinking in a neighboring room and was heavily intoxicated. An altercation took place in which White Grass was severely injured.

Cruz was arrested and charged with "[a]ssault resulting in serious bodily injury," 18 U.S.C. § 113(a)(6), which is a federal offense when committed by an Indian on an Indian reservation, 18 U.S.C. § 1153. He pled not guilty and went to trial, where his Indian status was a contested issue. At the close of the government's case-in-chief, Cruz moved for judgment of acquittal, contending that the government failed to establish his Indian status by proof beyond a reasonable doubt.[3] The district court denied the motion. Cruz subsequently took the stand in his own defense and was ultimately convicted. He now appeals, arguing that there was insufficient evidence that he is an Indian under § 1153 and that the district court committed reversible error when instructing the jury as to how to determine his Indian status.

## II.

The standard of review to be applied on appeal is contested by the parties. We begin by observing that, even though the question "of Indian status operates as a jurisdictional element under § 1153," *Bruce*, 394 F.3d at 1228, *de novo* review is not appropriate given the posture of this case. Although jurisdictional questions are ordinarily reviewed *de novo*, when a defendant brings a motion for acquittal in order to challenge

---

[3]As Cruz's Indian status is the central issue on appeal, we discuss the evidence introduced regarding this question in the text below.

the sufficiency of the *evidence* underlying a jurisdictional element, we owe deference to the jury's ultimate factual finding.[4] *See United States v. Gomez*, 87 F.3d 1093, 1097 n.3 (9th Cir. 1996) (citing *United States v. Vasquez-Velasco*, 15 F.3d 833, 838-39 (9th Cir. 1994)). Accordingly, if such a challenge is properly made, we review the district court's decision under the standard applied to sufficiency-of-the-evidence challenges: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted); *see United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1009-10 (9th Cir. 1995); *see also United States v. Morgan*, 238 F.3d 1180, 1185-86 (9th Cir. 2001) (noting applicability of this standard to jurisdictional elements).

Here, however, Cruz's sufficiency-of-the-evidence challenge made at the close of the prosecution's case-in-chief was not preserved because no new challenge was made following submission of all of the evidence. "The proper way . . . to

---

[4]This is not the case when the defendant moves for acquittal at the close of the government's case-in-chief and the district court *defers ruling* on that motion until it has reviewed all of the evidence. In that situation, we review "the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). However, where, as here, the district judge does not defer ruling but instead rules immediately, "a defendant waives his objection to the trial court's denial of a motion for acquittal . . . if he elects to present evidence on his own behalf." *United States v. Alexander*, 48 F.3d 1477, 1490 n.10 (9th Cir. 1995). Under such circumstances, "all the evidence — including the evidence presented by the defendant — can be considered." *Id.*

We note that the terms of art "motion for judgment of acquittal" and "challenge to the sufficiency of the evidence" are functionally equivalent: "Rule 29 motions for acquittal do not need to state the grounds upon which they are based because 'the very nature of such motions is to question the sufficiency of the evidence to support a conviction.' " *United States v. Viayra*, 365 F.3d 790, 793 (9th Cir. 2004) (quoting *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983)). Accordingly, we use the terms interchangeably.

challenge the sufficiency of the government's evidence pertaining to [a] jurisdictional element . . . is a motion for acquittal under Rule 29, presented at the close of the government's case-in-chief."[5] *Morgan*, 238 F. 3d at 1186 (internal quotation marks omitted) (quoting *United States v. Nukida*, 8 F.3d 665, 672-73 (9th Cir. 1993). But should such a motion be denied, it must be renewed following submission of all the evidence or it is deemed waived. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200 (9th Cir. 2000). Cruz failed to renew his motion. As a result, the standard of review in this case rises to the at least theoretically more stringent "plain error" standard. *Id.* at 1200-01 We say "theoretically" because, while plain-error review appears more stringent in theory, it is hard to comprehend how a standard can be any more stringent in actuality than that ordinarily applied to sufficiency-of-the-evidence challenges. As we observed in *Vizcarra-Martinez:*

> [U]nder our ordinary test — the standard applicable when the defendant makes all the proper motions — we cannot reverse unless there is a clear showing as to insufficiency: we must affirm if any rational trier of fact could have found the evidence sufficient. Thus, it is difficult to imagine just what consequences flow from our application of the [plain error] standard[ ] or to envision a case in which the result would be different because of the application of one rather than the other of the standards.

66 F.3d at 1010. Our case law, however, has repeatedly parsed the increasingly thin differences between standards of review, slicing ever finer and finer distinctions whose practical consequences are seemingly minuscule, if not micro-

---

[5]Alternatively, the defendant may forego the opportunity to move for acquittal at the close of the government's case-in-chief and may instead make such a motion after presenting a defense, *see* Fed. R. Crim. P. 29(a), although prudent counsel are unlikely to pass on the opportunity to make the motion at both junctures.

scopic. As a result of these exercises in abstraction, our standards of review continue to multiply, the relationships between them growing more obscure with each iteration. Still, because an existing decision of this court has clearly held that plain-error review applies when a jurisdictional element is the subject of an unrenewed motion for acquittal, we dutifully apply that standard in this case. *See Morgan*, 238 F.3d at 1186; *see also United States v. Singh*, 532 F.3d 1053, 1056-57 (9th Cir. 2008).

Under plain-error review, reversal is permitted only when there is (1) error that is (2) plain, (3) affects substantial rights, and (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). When a conviction is predicated on insufficient evidence, the last two prongs of the *Olano* test will necessarily be satisfied: A defendant's "substantial rights," as well as the "fairness" and "integrity" of the courts, are seriously affected when someone is sent to jail for a crime that, as a matter of law, he did not commit, or when the court, as a matter of law, has no jurisdiction to try him for the alleged offense. *See United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998) (noting that even under plain error review, a court should not "affirm a conviction and send a defendant to prison or his death if the record clearly showed that the evidence was insufficient" (quoting *Vizcarra-Martinez*, 66 F.3d at 1010)); *cf. United States v. Mize*, 756 F.2d 353, 355 (5th Cir. 1985) ("[E]rroneous instructions concerning the essential jurisdictional element of the crime charged affect substantial rights of the defendant."). Therefore, the analysis in this case turns primarily on the first two *Olano* prongs: Was the denial of Cruz's motion for judgment of acquittal error, and was it plainly so? Because Cruz "elect[ed] to present evidence on his own behalf . . . all the evidence — including the evidence presented by the defen-

dant — can be considered" in this analysis. *United States v. Alexander*, 48 F.3d 1477, 1490 n.10 (9th Cir. 1995).

### III.

**[1]** A "defendant's Indian status is an essential element of a § 1153 offense which the government must allege in the indictment and prove beyond a reasonable doubt." *Bruce*, 394 F.3d at 1229. We recently established the test for determining an individual's Indian status under 18 U.S.C. § 1152 in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), and the same test applies to the determination of Indian status under § 1152's companion statute, 18 U.S.C. § 1153. The *Bruce* test requires that the Government prove two things: that the defendant has a sufficient "degree of Indian blood," and has "tribal or federal government recognition as an Indian." *Id.* at 1223, 1224 (quoting *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996)).

**[2]** Cruz concedes that he meets the first prong of the test since his blood quotient is twenty-two percent Blackfeet. Only the second prong, therefore, is at issue here. In *Bruce* we outlined four factors that govern the second prong; those four factors are, "in declining order of importance, evidence of the following: '1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *Id.* at 1224 (quoting *United States v. Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995)); *accord. United States v. Ramirez*, 537 F.3d 1075, 1082 (9th Cir. 2008).[6]

---

[6]In *United States v. Ramirez*, the only issue apparently raised by the parties was whether "the documents produced at trial" were sufficient to demonstrate that the individuals in question were in fact enrolled members of the relevant tribe and therefore whether the first *Bruce* factor was satisfied. 537 F.3d at 1082. Presumably, since no other issue was addressed, the par-

Taken in the light most favorable to the government, the record reveals the following facts related to Cruz's Indian status:

1.  Cruz is not an enrolled member of the Blackfeet Tribe of Indians or any other tribe.

2.  Cruz has "descendant" status in the Blackfeet Tribe as the son of an enrolled member (his mother), which entitles him to use Indian Health Services, to receive some educational grants, and to fish and hunt on the reservation.

3.  Cruz has never taken advantage of any of the benefits or services to which he is entitled as a descendant.

4.  Cruz lived on the Blackfeet Reservation from the time he was four years old until he was seven or eight. He rented a room in a motel on the reservation shortly before the time of the offense.

ties in *Ramirez* did not dispute that the other evidence presented at trial, when combined with a finding that the individuals were enrolled members, "was sufficient to establish [their] status as 'Indians' within the meaning of § 1152." *Id.* at 1083. As *Bruce* itself makes clear, "[t]ribal enrollment is 'the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative' . . . . [E]nrollment, and indeed, even eligibility therefor, is not dispositive of Indian status." 394 F.3d at 1224-25 (quoting *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979)). Although the parties in *Ramirez* raised only a limited question, the opinion specifically acknowledges the *Bruce* test and the four applicable factors that are determinative of its second prong. *See Ramirez*, 537 F.3d at 1082. Because the dispute on appeal related to the facts underlying only *one* of the factors, the court had no reason to note the *relative weight* of the various other factors — specifically, that they are to be considered "in declining order of importance." *Bruce*, 394 F.3d at 1224. *But cf.* Dissenting Op. at 1615.

5.  As a descendant, Cruz was subject to the criminal jurisdiction of the tribal court[7] and was at one time prosecuted in tribal court.

6.  Cruz attended a public school on the reservation that is open to non-Indians and worked as a firefighter for the federal Bureau of Indian Affairs, a job that is also open to non-Indians.

7.  Cruz has never participated in Indian religious ceremonies or dance festivals, has never voted in a Blackfeet tribal election, and does not have a tribal identification card.

[3] Analyzing this evidence, it is clear that Cruz does not satisfy *any* of the four *Bruce* factors. As to the first and most important factor, it is undisputed that Cruz is not an enrolled member of the Blackfeet Tribe or any other tribe. In fact, Cruz is not even eligible to become an enrolled member of the Blackfeet Tribe, as he has less than one quarter Blackfeet blood, which is the minimum amount necessary for enrollment.[8]

---

[7]The parties have not cited to us any Blackfeet ordinances or codes establishing this point. As we explain *infra* pp.1611-12 & note 15, the fact that charges were brought against Cruz in tribal court does not necessarily mean the tribal court had jurisdiction over him. Our own reading of the Blackfeet code suggests that perhaps the tribe's criminal jurisdiction is limited to enrolled members of the Blackfeet Tribe and other tribes. *Cf.* BLACKFEET CODE § 1.1 ("The Blackfeet Tribal Court has jurisdiction over all persons of Indian descent, who are *members* of the Blackfeet Tribe of Montana and over all other American Indians unless its authority is restricted by an Order of the Secretary of the Interior.") (emphasis added). It is undisputed that Cruz is not an enrolled member of the Blackfeet Tribe or a member of any other American Indian tribe. However, because the Director of Tribal Enrollment testified that Cruz was subject to the tribe's criminal jurisdiction by virtue of his descendant status, and because Cruz did not contest this point below or on appeal, we assume for purposes of our analysis that Cruz was subject to the tribal court's jurisdiction.

[8]We also note that BLACKFEET ORD. 14, which establishes "procedures governing enrollment" and which was admitted into evidence at trial, states that children born after August 30, 1962 must have "one-fourth

*See* BLACKFEET CONST. art. II, amd. III, § 1(c). Our dissenting colleague would hold that the government has "plainly" met its burden under *Bruce* because it has established that Cruz has " 'descendant' status" and has therefore been "recognized" by "the tribal authorities." Dissenting Op. at 1614-15. The government, however, has expressly waived any argument that Cruz satisfies the first *Bruce* factor, and does not contend that his descendant status, *in and of itself*, is a factor we should consider in performing the *Bruce* analysis.[9] Rather, the government's argument is that "descendant status" is relevant only insofar as it renders someone "*eligible* to receive certain assistance reserved for Native Americans," language that directly tracks the second *Bruce* factor, except for substituting "eligible to receive" for actually receives. However, as we explain below, mere eligibility for benefits is of no consequence under *Bruce*. Given *Bruce*'s clear admonition that "tribal enrollment," and therefore *a fortiori* descendant status, "is not dispositive of Indian status," 394 F.3d at 1224-25, we reject the dissent's argument that mere descendant status with the concomitant eligibility to receive benefits is effectively sufficient to demonstrate "tribal recognition." To do otherwise would elevate tribal status to a "dispositive" determinant of

---

degree of Blackfeet Indian blood or more" in order to qualify for *descendant* status as well. *Id.* § 2(d). Under this ordinance, Cruz would not appear to qualify for any tribal status whatsoever. However, because the Director of Tribal Enrollment testified that Cruz enjoys descendant status — apparently despite the tribal regulations to the contrary — we treat him as enjoying that status for purposes of our analysis. We note the incongruity between his blood quotient and the tribal ordinance only to underscore the error of the dissent's placing near exclusive weight on Cruz's descendant status in concluding that Cruz is an Indian.

[9]This concession reflects a sensible understanding of the law. If, for example, a tribal authority declared that *anyone* with an ancestor who was a member of the tribe, no matter how distant, counts as a "descendant," we would be hard pressed to consider such an individual subject to prosecution under § 1153, even though "tribal authorities [would clearly] recognize [such a person] as an Indian" under our dissenting colleague's formulation. Dissenting Op. at 1615 (emphasis omitted).

Indian status, as *Bruce* explicitly forbids. Furthermore, given the government's explicit waiver of the argument, to hold as the dissent suggests would violate our longstanding general rule that we will not decide questions not raised by the parties before us. *See, e.g.*, *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996); *cf. United States v. Ziegler*, 497 F.3d 890, 901 (9th Cir. 2007) (Kozinski, J., dissenting from denial of rehearing en banc) ("We apply [the waiver] rule with some vigor against criminal defendants; we should be no less vigorous in applying it against the government." (internal citation omitted)).

[4] Nor is there any evidence that Cruz satisfies the second most important factor, "government recognition . . . through *receipt* of assistance reserved only to Indians." *Bruce*, 394 F.3d at 1224 (emphasis added). To the contrary, the only evidence in the record demonstrates that the opposite is true: Cruz testified that he had never "received . . . any benefits from the Blackfeet Tribe," and the government did not present any evidence to the contrary.[10] Nor did Cruz enjoy any benefits of tribal affiliation, as required by *Bruce*'s third most important factor. There is no evidence that he hunted or fished on the reservation, nor has it been suggested that his employment with the BIA was related to or contingent upon his tribal heritage.[11] The only evidence supporting any of the *Bruce* factors is that, for less than a quarter of his short life, Cruz lived

---

[10]While Cruz did attend school on the reservation for a period of time, the school was open to non-Indians.

[11]Employment with the BIA is open to non-Indians. While it is true that the BIA is permitted to give preference to Indians when making hiring decisions, *see* 25 U.S.C. §§ 472, 472a; *Morton v. Mancari*, 417 U.S. 535 (1974); 25 C.F.R. § 5.1, there is no indication in the trial record that Cruz ever received any preferential treatment on the basis of his ancestry. In fact, Cruz would not have been eligible for preferential treatment under the Indian Preference Laws, as he is not a member of a recognized tribe and has less than "one-half or more Indian blood of tribes indigenous to the United States." 25 C.F.R. § 5.1.

on the Blackfeet Reservation.[12] But even this only partially supports the government's position under the fourth *Bruce* factor, which also requires a showing of "participation in Indian social life." *Id.* Testimony both from Cruz and from a government witness indicated that Cruz does not practice Indian religion, has never "in any way participated in Native religious ceremonies," does not participate in Indian cultural festivals or dance competitions, has never voted in a Blackfeet election, and does not carry a tribal identification card. The government did not present any evidence suggesting that Cruz participated in any way in Indian social life.

**[5]** In sum, the evidence in this case, when taken in the light most favorable to the government, demonstrates that Cruz satisfies at best only a small part of the least important of the four *Bruce* factors. He does not satisfy any of the factors in full, and there is not even a scintilla of evidence suggesting that he satisfies a single one of the three most important factors. Were we to hold that evidence satisfying merely a portion of the least important *Bruce* factor is, in itself, sufficient to support a § 1153 conviction, we would be ignoring *Bruce*'s mandate in various respects, including its requirement that the factors be considered "in declining order of importance."[13] *Id.* The first three factors could not realisti-

---

[12]Although we base our analysis on the evidence in the record and not on the Pre-Sentencing Report, we note that the Report indicates that Cruz "returned to [the reservation] shortly before the instant offense." The evidence at trial was that he lived on the reservation for three to four years during his childhood and then moved back shortly before the instant offense.

[13]The dissent would have us excise this portion of *Bruce*'s holding from that opinion by dismissing it as "a stray comment." Dissenting Op. at 1615. This is a curious suggestion from our colleague, who, at one point, was the most vigorous proponent of the proposition that "an[y] issue *germane* to the eventual resolution of the case, [that has been] resolve[d] after reasoned consideration in a published opinion [is] the law of the circuit." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (Kozinski, J., concurring) (emphasis added); *see also Miller v. Gammie*,

cally be deemed more important than the fourth if a partial satisfaction of the fourth could outweigh the complete failure to satisfy any of the first three.

The government does not dispute our assessment of the record. Rather, in light of the near total lack of evidence that could satisfy the *Bruce* test as it is written, it urges us to expand *Bruce* by holding that mere "eligibility for . . . assistance" reserved to Indians is sufficient under the second *Bruce* factor.[14] But this is not what *Bruce* says. *Bruce* says that the second factor requires a showing of "*receipt* of assistance reserved only to Indians." *Id.* (emphasis added). We are not empowered to ignore such clear language in our circuit's precedent, *see Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc), especially when construing a statute that creates a "*carefully limited* intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes," *Bruce*, 394 F.3d at 1220 (emphasis added) (quoting *United States v. Antelope*, 430 U.S. 641, 642-43 n.1 (1977).

Even were we free to follow the government's recom-

---

335 F.3d 889, 900-01 (9th Cir. 2003) (en banc) (Kozinski, J., concurring). Here, the factors announced in *Bruce* and their relation to one another were indisputably part of the reasoning employed by the court in reaching its central holding. Accordingly, even under our dissenting colleague's more recent view on the due weight (or lack thereof) to be accorded to dicta, the language in *Bruce* cannot be ignored as the dissent urges because it is clearly not dicta. *Cf. Espinosa v. United Student Aid Funds, Inc.*, 545 F.3d 1113, 1119 n.3 (9th Cir. 2008) (Kozinski, J.) ("Anything [a prior case] has to say as to matters not presented in that case is . . . dicta and thus not binding on us."). Unless and until some intervening higher authority alters *Bruce*, we are bound by that decision. *See Miller*, 335 F.3d at 899 (majority opinion).

[14]As indicated above, the record demonstrates that descendants of enrolled Blackfeet members are entitled to use Indian Health Services, are eligible for certain scholarships, and are permitted to hunt and fish on the reservation. The government does not dispute that Cruz never took advantage of any of these benefits.

mended course, we would not. The four factors that constitute the second *Bruce* prong are designed to "probe[ ] whether the Native American has a sufficient non-racial link to a formerly sovereign people." *Bruce*, 394 F.3d at 1224 (quoting *St. Cloud v. United States*, 702 F. Supp. 1456, 1461 (D.S.D. 1988)). *Bruce* intentionally requires more than a simple blood test to determine whether someone is legally deemed an Indian. Given that many descendants of Indians are *eligible* for tribal benefits based exclusively on their blood heritage, the government's argument would effectively render the second *Bruce* factor a *de facto* nullity, and in most, if not all, cases would transform the entire *Bruce* analysis into a "blood" test. *Cf. id.* at 1223. For similar reasons, we cannot accept our dissenting colleague's argument that the *sole* test under *Bruce*'s second prong "is whether the *tribal authorities* recognize [someone] as an Indian, *not* whether he considers himself one." Dissenting op. at 1615 (second emphasis added). Under *Bruce*, the extent to which an individual considers himself an Indian — whether by deciding, for example, to "reside[ ] on a reservation," to "participat[e] in Indian social life," or to "recei[ve] assistance reserved only to Indians," *Bruce*, 394 F.3d at 1224 — is most certainly relevant in determining his Indian status. The dissent simply ignores the fact that *Bruce* clearly requires an analysis from the perspective of both the tribe *and* the individual.

The government and our dissenting colleague also argue that the fact that Cruz was prosecuted by the Blackfeet tribal court demonstrates that he is an Indian because a "tribe has no jurisdiction to punish anyone but an Indian." *Id.* at 1227; *see* Dissenting Op. at 1615. This argument is meritless for multiple reasons. First and foremost, the record in this case is incredibly thin with respect to Cruz's contact with the tribal justice system: all we know is that he has "been prosecuted." There is no evidence regarding the nature of that prosecution, to what stage, if any, it proceeded, and certainly the record does not indicate whether Cruz was ever determined for purposes of that prosecution to be an Indian. Finally, the record

does not suggest that the prosecution resulted in a conviction. Based on the evidence contained in the trial record, which is all that we may consider, Cruz's case may well have been dismissed for lack of jurisdiction after a finding that he is *not* an Indian.[15]

[6] Furthermore, while the government makes much of the fact that the court in *Bruce* considered the exercise of tribal jurisdiction over the defendant throughout her entire lifetime relevant, it fails to recognize the significantly different posture of that case. *Bruce* addressed a prosecution under § 1152. However, under § 1152, the question of Indian status is an *affirmative defense. Id.* at 1222-23 (citing *United States v. Hester*, 719 F.2d 1041, 1043 (9th Cir. 1983)). Generally, "the defendant must prove the elements of [an] affirmative defense by a preponderance of the evidence," unless some other standard is set by statute.[16] *United States v. Beasley*, 346 F.3d 930,

---

[15]Our dissenting colleague would equate the power to *arrest* with the power to determine Indian status, thereby delegating to every tribal police officer the determination of whether an individual may be prosecuted federally as an Indian. *See* Dissenting Op. at 1615 ("*[T]ribal authorities* recognize [Cruz] as an Indian . . . . That they do is confirmed by the fact that . . . the *tribal police* took him before the tribal court rather than turning him over to state or federal authorities. How that case was finally resolved is irrelevant . . . ." (second emphasis added)). We reject the dissent's unusual approach: both the legitimate reach of federal authority under the Constitution and the delicate question of whether an individual "counts" as an Indian for purposes of a federal criminal prosecution that could lead to his incarceration are issues too important to be decided on the basis of a single arrest and in the absence of any true judicial consideration.

[16]"[O]nce a defendant has satisfied his burden of production with respect to an affirmative defense, the burden shifts to the government to disprove the defense beyond a reasonable doubt." *Dominguez-Mestas*, 929 F.2d at 1383. Of course, the beyond-a-reasonable-doubt standard "requires more exacting proof" than the preponderance-of-the-evidence standard. *Jones v. United States*, 527 U.S. 373, 377 (1999). Simply put, "more 'facts in evidence' are needed . . . when the proponent is required to establish [a claim] not merely by a preponderance of the evidence but . . . beyond a reasonable doubt." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986) (alteration and second omission in original) (quoting *United States v. Taylor*, 464 F.2d 240, 242 (2d Cir. 1972).

935 (9th Cir. 2003); *see also United States v. Dominguez-Mestas*, 929 F.2d 1379, 1383 (9th Cir. 1991); *cf.* 18 U.S.C. § 17 (affirmative defense of insanity requires clear and convincing evidence). By contrast, under § 1153 Indian status is "an essential *element* of [the] offense which the government must . . . prove beyond a reasonable doubt" in every case. *Bruce*, 394 F.3d at 1229 (emphasis added). All that *Bruce* held was that "[t]he assumption and exercise of a tribe's criminal jurisdiction . . . bolster[ed] the argument that Bruce met her burden of producing sufficient evidence" *for an affirmative defense*. *Id.* at 1227. The court explicitly "caution[ed] that Bruce was *only* required to meet a production burden," which it later described as a "mere" burden of production. *Id.* (emphasis added). The burden here, by contrast, is on the government to prove Cruz's Indian status beyond a reasonable doubt. In this context, a showing that a tribal court on one occasion may have exercised jurisdiction over a defendant is of little if any consequence in satisfying the status element in a § 1153 prosecution.

**[7]** Because the evidence viewed in the light most favorable to the government does not demonstrate that Cruz is an Indian or that he meets *any* of the *Bruce* factors, no rational trier of fact could have found that the government proved the statutory element of § 1153 beyond a reasonable doubt. Accordingly, the district court's denial of the motion for judgment of acquittal was error. Where the government has failed to show that *any* of the *Bruce* factors has been satisfied, we have no trouble concluding that the error was "clear" and "obvious." *Olano*, 507 U.S. at 734. As described earlier, a conviction that erroneously rests on insufficient evidence necessarily implicates "substantial rights" and seriously affects the "fairness" and "integrity" of the judicial process. Accordingly, the denial of Cruz's motion for acquittal was not only error, but was plain error. We reverse the decision below and instruct the district court to grant the motion for judgment of acquittal.[17]

---

[17]Because we reverse the district court's denial of Cruz's motion for judgment of acquittal, we need not reach his claim that the district court

IV.

For the reasons stated above, the decision below is **REVERSED** and the judgment of conviction **VACATED**. The district court is instructed to grant the motion for judgment of acquittal.

---

KOZINSKI, Chief Judge, dissenting:

Because defendant has the requisite amount of Indian blood, the only question is whether he has "tribal or government recognition as an Indian." *United States* v. *Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005) (quoting *United States* v. *Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979) for the "generally accepted test," derived from *United States* v. *Rogers*, 45 U.S. (4 How.) 567, 573 (1846)). He plainly does. The record discloses that the Blackfeet tribal authorities have accorded Cruz "descendant" status, which entitles him to many of the

---

improperly instructed the jury with respect to the relative weight the four *Bruce* factors are to receive. However, since this question could well arise in other prosecutions, we take this opportunity to explain that the district court's instruction in this case was erroneous because it failed to inform the jury that the *Bruce* factors must be considered "in declining order of importance," as stated in *Bruce*. 394 F.3d at 1224; *cf. supra* note 13. When a district court omits this crucial language, the jury receives no instruction regarding the factors' relative importance and may erroneously give the various factors equal or disproportionate weight. A jury so instructed, including Cruz's jury, might place undue weight on, for example, the fourth factor, which in this case was partially satisfied, and as a result may mistakenly "convict without finding all the elements of a crime beyond a reasonable doubt." *United States v. Rubio-Villareal*, 967 F.2d 294, 297 (9th Cir. 1992). To avoid this problem, the words "in declining order of importance" should, as a matter of course, always be included in a *Bruce* instruction. Despite our dissenting colleague's fervent protestation of outrage, *see* Dissenting op. at 1617-18, we are aware of nothing novel about informing a jury what matters it should consider, and in what manner, when determining whether an element of an offense has been met.

benefits of tribal membership, including medical treatment at any Indian Health Service facility in the United States, certain educational grants, housing assistance and hunting and fishing privileges on the reservation.

That Cruz may not have taken advantage of these benefits doesn't matter because the test is whether the *tribal authorities* recognize him as an Indian, not whether he considers himself one. That they do is confirmed by the fact that, when he was charged with an earlier crime on the reservation, the tribal police took him before the tribal court rather than turning him over to state or federal authorities. How that case was finally resolved is irrelevant; what matters is that the tribal authorities protected him from a state or federal prosecution by treating him as one of their own. Finally, Cruz was living on the reservation when he was arrested, another piece of evidence supporting the jury's verdict.

The majority manages to work its way around all of this evidence by taking a stray comment in *Bruce* to the effect that certain factors have been considered in "declining order of importance" and turning it into a four-part balancing test. But *Bruce* was not announcing a rule of law; it was merely reporting what it thought other courts had done: "[C]ourts have considered, in declining order of importance, evidence of [four factors]." 394 F.3d at 1224. *Bruce* did not adopt this as any sort of standard, nor did it have any cause to do so, as nothing in *Bruce* turned on the relative weight of the factors. The majority strains hard to make this part of *Bruce*'s holding, but a *fair* reading of the opinion discloses that it's not even dicta because it's descriptive rather than prescriptive. We recognized this the last time we applied the test by omitting any reference to the declining order of importance. *See United States* v. *Ramirez*, 537 F.3d 1075, 1082 (9th Cir. 2008).

*Bruce* borrowed the "declining order of importance" language from *United States* v. *Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995), and *Lawrence* itself was quoting the observation

of a district judge in an earlier case, *St. Cloud* v. *United States*, 702 F.Supp. 1456, 1461-62 (D.S.D. 1988). The district judge in *St. Cloud* did not cite most of the cases he relied on, so it's hard to tell whether his observation is correct, but he did offer a note of caution that my colleagues overlook: "These factors do not establish a precise formula for determining who is an Indian. Rather, they merely guide the analysis of whether a person is recognized as an Indian." *Id.* at 1461.

This is the opposite of what my colleagues do today: They turn the four factors into a rigid multi-part balancing test, with the various prongs reinforcing or offsetting each other, depending on how they are analyzed. This is not what the judge in *St. Cloud* had in mind, and certainly nothing like what *Bruce* adopted as the law of our circuit. It is an invention of the majority in our case, designed to take power away from juries and district judges and give it to appellate judges. Nothing in the law, dating back to the Supreme Court's opinion in *Rogers*, justifies this fine mincing of the evidence. The question we must answer is whether there is enough evidence from which a rational jury could have concluded beyond a reasonable doubt that Cruz was recognized as an Indian. Clearly there was, and that's the end of our task.

The majority misreads *Bruce* and misrepresents my position: "Given *Bruce*'s clear admonition that 'tribal enrollment,' and therefore *a fortiori* descendant status, 'is not dispositive of Indian status,' we reject the dissent's argument that mere descendant status with the concomitant eligibility to receive benefits is effectively sufficient to demonstrate 'tribal recognition.'" Maj. op. at 1607 (quoting *Bruce*, 394 F.3d at 1224-25). *Bruce* certainly doesn't hold that tribal enrollment is insufficient to support a finding of Indian status. *Bruce* holds the converse: that the absence of tribal enrollment does not preclude finding that defendant is an Indian—which was the question presented here. To suggest, as does the majority, that an individual who *is* enrolled as a member of a tribe

might not be an Indian after all is not only preposterous, it's unnecessary, as no one claims that Cruz was enrolled.

Nor do I maintain, as the majority makes believe, that Cruz's descendant status is enough to make him an Indian. Whether or not it is, there are additional facts here: Cruz's residence on the reservation and the fact that he was previously arrested and brought before the tribal court. The latter is a fact that the *Bruce* majority held to be highly significant. *Bruce* did not consider the *disposition* of prior tribal court cases relevant and we are not free to disregard the arrest and prosecution by tribal authorities on this spurious basis.

Worse still, after huffing and puffing for 11 hefty paragraphs and 12 chubby footnotes trying to explain why the district court erred at all, the majority concludes in a single opaque sentence that the error is "plain." Just how plain can this error be when the majority has to struggle so long and hard to find any error at all? After complaining bitterly about pointyheaded judges who "slic[e] ever finer and finer distinctions whose practical consequences are seemingly minuscule, if not microscopic," maj. op. at 1602-03, my colleagues pull out a scalpel of their own and proceed to engage in the same exercise, so that "our standards of review continue to multiply, the relationships between them growing more obscure with each iteration." *Id.* at 1603. Before reading today's opinion, no one could have guessed its outcome and methodology. Saying that the error is plain eviscerates the "plain" part of the plain error standard. If this is plain error, no error isn't.

Not satisfied with merely reversing the verdict, the majority goes a bridge too far by converting its novel four-part test into a jury instruction. This is wholly unnecessary, as Cruz cannot be tried again for violating 18 U.S.C. § 1153 because of double jeopardy. It is also wrong. We don't instruct juries as to how to weigh the evidence; that is their function, not ours. Yet the majority now requires jurors to assign relative weight to various pieces of evidence presented to them. I am aware

of no such instruction anywhere else in our jurisprudence and the majority points to none. It is a bold step into uncharted territory and, in my judgment, an unwise one.

*   *   *

The majority engages in vigorous verbal callisthenics to reach a wholly counter-intuitive—and wrong—result. Along the way, it mucks up several already complex areas of the law and does grave injury to our plain error standard of review. I hasten to run in the other direction.