**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee*,

v.

DAMIEN ZEPEDA,
                    *Defendant-Appellant*.

No. 10-10131

D.C. No.
2:08-cr-01329-
ROS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Chief District Judge, Presiding

Argued and Submitted
July 17, 2012—San Francisco, California

Filed January 18, 2013

Before: Ferdinand F. Fernandez, Richard A. Paez,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Watford

# SUMMARY[*]

## Criminal Law

The panel reversed jury convictions under the Major Crimes Act, 18 U.S.C. § 1153, which provides for federal jurisdiction over certain crimes committed by Indians in Indian country.

The panel held that whether a given tribe is federally recognized, as required for jurisdiction under § 1153, is a question of fact for the jury, not a question of law for the court; and rejected the government's request that this court take judicial notice of the Bureau of Indian Affairs's list of federally recognized tribes in 2008 and 2010.

The panel held that a Certificate of Enrollment in an Indian tribe, entered into evidence through the parties' stipulation, is insufficient evidence for a rational juror to find beyond a reasonable doubt that a defendant is an Indian for purposes of § 1153, where the government offers no evidence that the defendant's bloodline is derived from a federally recognized tribe.

Dissenting, Judge Watford would hold that federal recognition of an Indian tribe is a question of law for the court to resolve.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Joan G. Ruffennach, Assistant United States Attorney, Office of the United States Attorney, Phoenix, Arizona, for Plaintiff-Appellee.

Michele R. Moretti, Law Office of Michele R. Moretti, Lake Butler, Florida, for Defendant-Appellant.

**OPINION**

PAEZ, Circuit Judge:

On October 25, 2008, Damien Zepeda ("Zepeda") traveled with his brothers Jeremy and Matthew Zepeda ("Matthew") to the home of Dallas Peters ("Peters"), located on the Ak–Chin Reservation of Arizona. Zepeda and Matthew opened fire upon the house's occupants, injuring Peters severely. In a nine-count indictment, the government charged Zepeda with, *inter alia*, conspiracy to commit assault, assault with a deadly weapon, and use of a firearm during a crime of violence.[1] The indictment alleged that

---

[1] The nine counts included: (1) conspiracy to commit assault with a dangerous weapon and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153, 371, and 2; (2) assault resulting in serious bodily injury against Dallas Peters, in violation of 18 U.S.C. §§ 1153, 113(a)(6) and 2; (3) use of a firearm during a crime of violence as charged in count 2, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; (4), (6), (8) assault with a dangerous weapon against Dallas Peters, Stephanie Aviles, and Jane Doe, in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 2; and, (5), (7), (9) use of a firearm during the crimes of violence charged in counts 4, 6, and 8, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. Aviles

Zepeda was an "Indian[]." Following a jury trial, Zepeda was convicted of all counts.

The Major Crimes Act, 18 U.S.C. § 1153, provides for federal jurisdiction for certain crimes committed by Indians in Indian country.[2] The statute does not define who is an Indian, and determining the proper boundaries of federal jurisdiction over Indians is a formidable task. It is now well-settled in this circuit that we apply the two-part test articulated in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005) to determine who is an Indian. We consider: (1) the defendant's degree of Indian blood, and (2) the defendant's tribal or government recognition as an Indian. *Id.* at 1223; *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009). More recently, we clarified that the first of these two prongs requires that the defendant's "bloodline be derived from a federally recognized tribe."[3] *United States v. Maggi*, 598 F.3d 1073, 1080 (9th Cir. 2010).

This appeal calls upon us to decide whether a Certificate of Enrollment in an Indian tribe, entered into evidence through the parties' stipulation, is sufficient evidence for a rational juror to find beyond a reasonable doubt that the defendant is an Indian for the purposes of § 1153 where the government offers no evidence that the defendant's bloodline

---

was Zepeda's ex-girlfriend and Doe was Aviles's cousin. Both were present at the Peters residence on the night of the shooting.

[2] Although we are mindful that the term "Native American" or "American Indian" may be preferable, we use the term "Indian" throughout this opinion since that is the term used in 18 U.S.C. § 1153 and at issue in this appeal.

[3] In this opinion, we consider the first prong only.

is derived from a federally recognized tribe.  We hold that it is not.

## I.

At Zepeda's trial, the government introduced into evidence a document entitled "Gila River Enrollment/Census Office Certified Degree of Indian Blood."[4]  The document bore an "official seal" and stated that Zepeda was "an enrolled member of the Gila River Indian Community," and that "information [wa]s taken from the official records and membership roll of the Gila River Indian Community."  It also stated that Zepeda had a "Blood Degree" of "1/4 Pima [and] 1/4 Tohono O'Odham" for a total of ½.  The Certificate was signed by "Sheila Flores," an "Enrollment Services Processor."  The prosecutor and Zepeda's attorney stipulated to admission of the Certificate into evidence without objection.[5]  Their stipulation stated: "The parties have conferred and have agreed that Exhibit 1[, the Tribal Enrollment Certificate,] . . . may be presented at trial without objection and [its] contents are stipulated to as fact."

The Tribal Enrollment Certificate was published to the jury through the testimony of Detective Sylvia Soliz, a detective for the Ak–Chin Police Department, who told the jury that she obtained the Certificate from the Gila River Indian Community in advance of trial, "confirming" that

---

[4] For the purposes of clarity, we refer to this document as the "Tribal Enrollment Certificate" or "Certificate" throughout.

[5] The stipulation, which was signed by counsel, was admitted into evidence as Exhibit 48.

Zepeda was an enrolled member. The colloquy between Soliz and the prosecutor proceeded as follows:

> Q: [W]e've talked a little bit about Native Americans and Indian blood and that sort of thing. Is this a jurisdictional requirement that you have? Explain that for the jury.
>
> A: Yes, it is. I am only able to investigate if the witness would come to a federal status and the victim was an enrolled member of a tribe or – and if it occurred on the reservation boundaries.
>
> . . .
>
> Q: You talked about a certification of Indian blood. What is that?
>
> A: It's a piece of paper confirming through the tribe that you obtained from the enrollment office that confirms that this person is an enrolled member of their tribe and he[,] and they[,] do meet the blood quantum.
>
> Q: And is that sometimes used in determining whether that person might be able to receive tribal benefits from the tribe?
>
> A: Yes, it does.

Zepeda's brother Matthew also testified regarding Zepeda's Indian status. Matthew testified that he was half

"Native American," from the "Pima and Tiho" tribes, and that his Indian heritage came from his father. He also testified that he and Zepeda shared the same father, as well as the same mother, who was "Mexican."

No further evidence regarding Zepeda's Indian status was admitted. At the close of the government's case in chief, Zepeda moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that insufficient evidence supported his convictions.[6] The court denied his motion. Zepeda renewed his motion at the close of the evidence, and again, his motion was denied.

On appeal, Zepeda argues, *inter alia*, that the government failed to prove beyond a reasonable doubt that he was an Indian under § 1153. We agree.

## II.

Indian "tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country."[7] *United States v. LaBuff*, 658 F.3d 873, 876 (9th

---

[6] We note that although Zepeda did not present argument to the district court regarding the sufficiency of the evidence of his Indian status, "Rule 29 motions for acquittal do not need to state the grounds upon which they are based because 'the very nature of such motions is to question the sufficiency of the evidence to support a conviction.'" *United States v. Viayra*, 365 F.3d 790, 793 (9th Cir. 2004) (quoting *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983)).

[7] "[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof . . . and (c) all Indian allotments, the Indian titles to which

Cir. 2011). As we explained in *United States v. Begay*, 42 F.3d 486 (9th Cir. 1994):

> Indian tribes are recognized as quasi-sovereign entities that may regulate their own affairs except where Congress has modified or abrogated that power by treaty or statute. Courts have also recognized, however, that regulation of criminal activity in Indian country is one area where competing federal interests may override tribal interests.

*Id.* at 498.

To balance the sovereignty interest of Indian tribes and the United States's interest in punishing offenses committed in Indian country, Congress enacted two statutes, 18 U.S.C. §§ 1152 and 1153. *Id.* Section 1152, the General Crimes Act,[8] grants federal jurisdiction over certain crimes

---

have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151.

[8] Section 1152 provides that:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations,

committed by non-Indians against Indians in Indian country, but excludes crimes committed by one Indian against another. *Id.*; *LaBuff*, 658 F.3d at 876. Section 1153, the Major Crimes Act,[9] creates federal jurisdiction for cases in which an Indian commits one of a list of thirteen enumerated crimes against another Indian in Indian country. *Id.* The government charged Zepeda and prosecuted him under the latter statute.

The question of Indian status operates as a jurisdictional element under § 1153. *Cruz*, 554 F.3d at 843; *Bruce*, 394 F.3d at 1228. Nonetheless, we have held that Indian status "is an element of the offense that must be alleged in the indictment and proved beyond a reasonable doubt." *Maggi*,

---

the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152.

[9] Section 1153(a) provides:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a).

598 F.3d at 1077 (citing *Cruz*, 554 F.3d at 845; *Bruce*, 394 F.3d at 1229). We have also held that whether a defendant is an Indian is a mixed question of fact and law that must be determined by the jury.[10] *See Bruce*, 394 F.3d at 1218, 1223, 1229; *see also Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845. Indeed, it is the special province of the jury to resolve any factual disputes arising under the two prongs of the *Bruce* test. *See Bruce*, 394 F.3d at 1223; *Maggi*, 598 F.3d 1082-83; *Cruz*, 554 F.3d at 846-47.

"Although jurisdictional questions are ordinarily reviewed de novo, when a defendant brings a motion for acquittal in order to challenge the sufficiency of the *evidence* underlying a jurisdictional element, we owe deference to the jury's ultimate factual finding." *Cruz*, 554 F.3d at 843–44. "Accordingly . . . we review the district court's decision under the standard applied to sufficiency-of-the-evidence challenges: 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 844 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted)); *see also United States v. Nevils*, 598 F.3d 1158, 1163–67 (9th Cir. 2010) (en banc).

---

[10] As we explained in *Bruce*, "[m]ixed questions of law and fact are those in which 'the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.'" 394 F.3d at 1218 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19 (1982)).

## III.

### A.

We first must determine whether the Tribal Enrollment Certificate was properly admitted into evidence, or rather, as Zepeda urges, whether its admission violated his rights under the Confrontation Clause. Because Zepeda did not object at trial to the district court's admission of the Certificate pursuant to the parties' stipulation, we review for plain error. *United States v. Wright*, 625 F.3d 583, 607 (9th Cir. 2010).

"The test regarding the validity of a stipulation is voluntariness." *United States v. Molina*, 596 F.3d 1166, 1168–69 (9th Cir. 2010). We have previously held that "'[s]tipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions.'" *Id.* at 1169 (quoting *United States v. Technic Servs.*, 314 F.3d 1031, 1045 (9th Cir. 2002) (alteration in original)). "'[S]tipulations serve both judicial economy and the convenience of the parties, [and] courts will enforce them absent indications of involuntary or uninformed consent.'" *Id.* (quoting *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999) (alterations in original)). "A 'defendant who has stipulated to the admission of evidence cannot later complain about its admissibility' unless he can show that the stipulation was involuntary." *Id.* (quoting *Technic Servs.*, 314 F.3d at 1045).

Zepeda points to no record evidence that he entered into the stipulation at issue involuntarily. Rather, he points to a lack of record evidence that his attorney informed him of the contents of the stipulation and its legal effect, and asserts that his counsel's waiver of his Confrontation Clause rights was

invalid. While his first contention is plausible, Soliz testified extensively regarding the Tribal Enrollment Certificate's contents, referring both to Zepeda's bloodline and to his eligibility for benefits from the Gila River Indian Community. This testimony at least put Zepeda on notice regarding the contents of the stipulation. Regardless, Zepeda bears the burden on appeal of pointing to record evidence showing that his consent was involuntary, and he has not done so here. *See Molina*, 596 F.3d at 1169.

Moreover, our case law recognizes that "defense counsel may waive an accused's constitutional rights as a part of trial strategy." *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008). Counsel's authority extends to waivers of the accused's Sixth Amendment right to cross-examination and confrontation as a matter of trial tactics or strategy. *Wilson v. Gray*, 345 F.2d 282, 287–88 (9th Cir.), *cert. denied*, 382 U.S. 919 (1965).

Zepeda argues that waiver of a fundamental constitutional right cannot *ever* constitute a sound trial strategy, particularly where, as here, the Tribal Enrollment Certificate purported to establish an essential jurisdictional element. It appears from the record, however, that Zepeda's attorney strategically focused Zepeda's defense on the implausibility of government witnesses' testimony, as compared to Zepeda's markedly different version of the relevant events. He chose not to direct the jury's attention to Zepeda's Indian status, and informed the jury during his opening statement: "I will stipulate and concede things that ought to be conceded in terms of my client, Mr. Zepeda." Although ultimately not a winning strategy, it was clearly "deliberately made as a matter of trial tactics," and did not involve a "basic trial right[]" such as the decision "whether to plead guilty, waive

a jury, testify in his . . . own behalf, or take an appeal." *Gamba*, 541 F.3d at 901 (quoting *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (internal quotation marks omitted)). Nor, as we discuss at length below, was the Tribal Enrollment Certificate sufficient to carry the government's burden of proof of Zepeda's Indian status. Thus, Zepeda's attorney did not violate Zepeda's Confrontation Clause rights when he stipulated to admission of the Certificate. *See Gamba*, 541 F.3d at 900; *Wilson*, 345 F.2d at 287.

Accordingly, we conclude that the district court did not plainly err in admitting the Tribal Enrollment Certificate into evidence pursuant to the parties' stipulation.

**B.**

Having determined that the Tribal Enrollment Certificate was properly admitted into evidence, we turn to whether, viewing all evidence in the light most favorable to the government, any rational juror could have found beyond a reasonable doubt that Zepeda was an Indian, on the basis of the slim evidence as to both prongs of the *Bruce* test.

As noted, "[t]he *Bruce* test requires that the Government prove two things: that the defendant has a sufficient 'degree of Indian blood,' and has 'tribal or federal government recognition as an Indian.'" *Cruz*, 554 F.3d at 845 (quoting *Bruce*, 394 F.3d at 1223, 1224). "The first prong requires 'some' Indian blood." *United States v. Ramirez*, 537 F.3d 1075, 1082 (9th Cir. 2008) (quoting *Bruce*, 394 F.3d at 1223). "Thus, 'evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong.'" *Id.* (quoting *Bruce*, 394 F.3d at 1223).

"The second prong requires evidence that 'the Native American has a sufficient non-racial link to a formerly sovereign people.'" *Id.* (quoting *Bruce*, 394 F.3d at 1224). "Courts analyzing this prong have considered evidence of: '1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.'" *Id.* (quoting *Bruce*, 394 F.3d at 1224). These four factors "are to be considered 'in declining order of importance.'" *Cruz*, 554 F.3d at 846 n. 6 (quoting *Bruce*, 394 F.3d at 1224). "[T]ribal enrollment is 'the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative' . . . . [E]nrollment, and indeed, even eligibility therefor, is not dispositive of Indian status." *Id.* (quoting *Bruce*, 394 F.3d at 1224-25 (some alterations in original)).

Our recent decision in *United States v. Maggi* made clear that "[t]here is an important overlay to the *Bruce* test: To be considered an Indian under . . . [§] 1153, the individual must have a sufficient connection to an Indian tribe that is *recognized by the federal government*. Affiliation with a tribe that does not have federal recognition does not suffice." 598 F.3d at 1078 (emphasis in original).

In *Maggi*, the court addressed the consolidated appeals of two defendants, Gordan Mann and Shane Maggi, both tried and convicted pursuant to § 1153. Mann was an enrolled member of the Little Shell Tribe of the Chippewa Cree, a tribe that was not recognized by the federal government, despite a longstanding petition for federal recognition. *Id.* at 1076. The court noted that tribal enrollment records often

include identification of an individual's percentage of Indian blood, and that this information is used to establish eligibility for enrollment. *Id.* Mann's enrollment record reflected his degree of Indian blood as 10/64 Chippewa and 11/64 other Indian blood. *Id.* Maggi's degree of Indian blood was 1/64 Blackfeet tribe, a tribe recognized by the federal government, and 1/32 Cree tribe. *Id.* at 1076, 1081–81. The record did not reflect whether Maggi was descended from a federally recognized group of the Cree tribe, such as the Rocky Boy Reservation Chippewa Cree, or a non-recognized group, such as the Little Shell Tribe Chippewa Cree. *Id.* Maggi was not an enrolled member of any tribe, though his mother's enrollment in the Blackfeet tribe entitled him to the receipt of certain limited benefits. *Id.* at 1076–77. Both Mann and Maggi argued in the district court that they were not subject to prosecution under § 1153 because they were not Indians. *Id.*

The court in *Maggi* commented that we had previously addressed the issue of whether prosecution under § 1153 requires membership in a federally recognized tribe in *LaPier v. McCormick*, 986 F.2d 303, 304–06 (9th Cir. 1993). In a federal habeas petition under 28 U.S.C. § 2254, LaPier challenged his Montana state court conviction, maintaining that he should have been tried for his alleged crime in federal court under § 1153 because he was an Indian. LaPier, like Mann, was a member of the Little Shell Tribe of Chippewa Cree. *Id.* at 306. The court reasoned that it did not need to examine whether LaPier had shown a sufficient degree of Indian blood or whether he had a sufficient connection to a tribe because he had failed to satisfy an *antecedent* requirement of affiliation with a federally recognized tribe:

> We need not address . . . the question whether LaPier has shown a significant degree of blood and sufficient connection to his tribe to be regarded as one of its members for criminal jurisdiction purposes. There is a simpler threshold question that must be answered first, and in this case it is dispositive: Is the Indian group with which LaPier claims affiliation a federally acknowledged Indian tribe? If the answer is no, the inquiry ends. A defendant whose only claim of membership or affiliation is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes.

*Id.* at 304–05 (internal quotation marks and citations omitted). The court therefore concluded that LaPier was not entitled to habeas relief.

*Maggi* recognized that *LaPier*'s threshold requirement of affiliation with a federally recognized tribe stemmed from judicial and legislative acknowledgment that federal criminal jurisdiction over Indians is not dependent on a racial classification, but upon the federal government's relationship with the Indian nations as separate sovereigns. 598 F.3d at 1078–79 (discussing *LaPier*, 986 F.2d at 305 ("Federal legislation treating Indians distinctively is rooted in the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a guardian-ward status, to legislate on behalf of federally recognized Indian tribes."), *United States v. Antelope*, 430 U.S. 641, 646 (1977) ("[F]ederal regulation of Indian affairs is not based upon

impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as 'a separate people' with their own political institutions. . . . [I]t is not to be viewed as legislation of a 'racial' group consisting of 'Indians' . . . .") (quoting *Morton v. Mancari*, 417 U.S. 535, 553 n. 24 (1974), and *Means v. Navajo Nation*, 432 F.3d 924, 930 (9th Cir. 2005)).

Accordingly, *Maggi* concluded that *LaPier*'s requirement of affiliation with a federally recognized tribe was not altered or superseded by the test announced in *Bruce*, "which presupposes that 'tribal or government recognition as an Indian' means as an Indian from a federally recognized tribe." *Maggi*, 598 F.3d at 1079 (quoting *Bruce*, 394 F.3d at 1223). It followed from this analysis that the first prong of the *Bruce* test requires "that the bloodline be derived from a federally recognized tribe." *Id.* at 1080.[11]

## C.

We must therefore determine whether the evidence the government presented at trial was sufficient, drawing all inferences in the government's favor, to satisfy the threshold question identified in *LaPier* and *Maggi*, namely, whether

---

[11] Applying this test, the court concluded that federal criminal jurisdiction was lacking over Mann because there was an "absence of evidence" before the jury that he had blood from a federally recognized tribe. *Id.* at 1080. His bloodline derived solely from a non-recognized tribe and "other" Indian blood, with no particular tribal affiliation. *Id.* Maggi, by contrast, had a bloodline of 1/64 Blackfeet tribe, a federally recognized tribe. The court declined to determine whether this quantum was sufficient to meet the requirement of "some blood," but found the government's showing insufficient as to the four factors relevant to the second prong of the *Bruce* test. *Id.* at 1081–83.

Zepeda's bloodline is derived from a federally recognized tribe. The Tribal Enrollment Certificate identifies Zepeda's bloodline as 1/4 Pima and 1/4 Tohono O'Odham. The government introduced *no* evidence that either is a federally recognized tribe. Matthew's testimony is equally unilluminating, since he described his ancestral bloodline as "Pima and Tiho."

The government (and the dissent) argues that whether a given tribe is federally recognized is a question of law that should be determined by the court rather than the jury, and requests, at this late stage, that we take judicial notice of the fact that both the "Gila River Indian Community of the Gila River Indian Reservation, Arizona" and the "Tohono O'Odham Nation of Arizona" are federally-recognized Indian tribes.[12] We address each issue in turn.

**a.**

*Bruce* and its progeny make clear that Indian status is an element of any § 1153 offense, and as such, that it must be alleged in the indictment and proven beyond a reasonable doubt. 394 F.3d at 1229; *Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845. The government contends, nonetheless, that our case law has treated the fact of federal recognition as a purely legal question. We do not agree.

---

[12] The names of both tribes, the government argues, appear in the Bureau of Indian Affairs lists of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs" published on April 4, 2008 and October 1, 2010. *See* 73 Fed. Reg. 18553 (April 4, 2008); 75 Fed. Reg. 60810 (Oct. 1, 2010).

In *LaPier*, having determined that "[i]t is . . . the existence of the special relationship between the federal government and the tribe in question that determines whether to subject the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country," the court stated that, "[t]o determine whether that special relationship exists—whether the United States recognizes a particular tribe—we defer 'to the political departments.'" 986 F.2d at 305 (quoting *Baker v. Carr*, 369 U.S. 186, 215 (1962)) (additional citations omitted). The court indicated that such deference was owed to the Bureau of Indian Affairs, and commented that its list of federally recognized tribes published in the Federal Register pursuant to 25 C.F.R. pt. 83 "appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." *Id.* Consulting this list, the court determined that LaPier was not an Indian because the tribe with which he claimed affiliation was not among the listed tribes. *Id.* at 306 ("LaPier contends that he is an enrolled member of the Little Shell Band of Landless Chippewa Indians of Montana. Even if he is, that fact makes no difference because his claim to Indian status fails the threshold test. The Little Shell Band of Landless Chippewa Indians of Montana is not a federally acknowledged tribe of Indians. Thus, while LaPier may be an Indian in an anthropological or ethnohistorical sense, he is not an Indian for purposes of criminal jurisdiction.") (citation and footnote omitted).

In *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974), the court considered the effect of the Klamath Termination Act, 25 U.S.C. § 564 *et seq.*, on the defendant's criminal conviction under § 1153, and found that federal criminal jurisdiction over the defendant was lacking because the Act

terminated federal supervision over the Klamath Tribe. *Id.* at 19 ("The Klamath Termination Act . . . was intended to end the special relationship that had historically existed between the Federal Government and the Klamath Tribe. While anthropologically a Klamath Indian even after the Termination Act obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists. . . . We conclude accordingly that 18 U.S.C. § 1153 cannot serve to confer Federal jurisdiction with respect to crimes committed by terminated Klamath Indians.").

Finally, in *Maggi*, discussed at length above, the court found that the threshold requirement of a bloodline from a federally recognized tribe was lacking for one defendant because there was an absence of evidence that his bloodline derived from a recognized tribe. 598 F.3d at 1080. This precedent, considered as a whole, reflects our recognition that there is a legal element embedded in the first prong of the *Bruce* test: Federal recognition is a legal status afforded to "American Indian groups indigenous to the continental United States . . . that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." 25 C.F.R. § 83.3. The Bureau of Indian Affairs, in accordance with the governing regulations, affords the legal designation of federal recognition to those tribes that meet its criteria. *See id.* §§ 83.1–83.13 (noting procedures for establishing that an American Indian group exists as an Indian tribe). As we said in *LaPier*, "absent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." 986 F.2d at 305.

It does not follow, however, that federal recognition is self-evidencing. To the contrary, the question of whether a given tribe *is indeed listed* among the tribes recognized by the federal government remains quintessentially factual in nature. Our case law is clear that federal recognition, like all elements of Indian status, must be proved to the jury beyond a reasonable doubt. *See Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845; *Bruce*, 394 F.3d at 1229; *see also* Ninth Cir. Model Jury Instr. No. 8.113 ("In order for the defendant to be found to be an Indian, the government must prove the following, beyond a reasonable doubt: First, the defendant has descendant status as an Indian, such as being a blood relative to a parent, grandparent, or great-grandparent who is clearly identified as an Indian from a *federally recognized tribe* . . . .") (emphasis added); *id.* cmt. ("The question of Indian status operates as a jurisdictional element under 18 U.S.C. § 1153. 'Some blood' evidence must be from a federally recognized tribe.") (citations omitted). The government is not relieved of its evidentiary burden in a prosecution under § 1153 simply because federal recognition by the Bureau of Indian Affairs, at the end of the administrative process, is a legal designation.[13]

The government and dissent draw an analogy to territorial jurisdiction cases, and argue that the judge should determine the existence of federal recognition as a matter of law and so instruct the jury. Further, the government and dissent would

---

[13] We note that meeting the government's burden of proof is hardly an onerous task. The government could, *inter alia*, present live testimony from a competent employee of the Bureau of Indian Affairs, request that the district court take judicial notice of the Bureau of Indian Affairs's list of federally recognized tribes published in the Federal Register, or stipulate with defense counsel to the fact of a given tribe's federal recognition.

have *this* court make such a finding where the prosecution failed to present evidence of federal recognition and the district court made no such finding.  In *United States v. Gipe*, 672 F.2d 777 (9th Cir. 1982) (per curiam), we explained that in "territorial jurisdiction cases, where the exercise of federal jurisdiction over a specific geographic area is necessary to vest jurisdiction in federal court . . . the court may determine as a matter of law the existence of federal jurisdiction over the geographic area, [although] the locus of the offense within that area is an issue for the trier of fact."  *Id.* at 779.  We also explained, however, that where the "locus of the act . . . constitutes an element of the crime . . . the prosecution should bear the burden of proof as to the status of the site" beyond a reasonable doubt.  *Id.*  As discussed at length *supra*, Indian status under § 1153 is an element of the offense.  The government, therefore, must prove this element, like any other, by making a sufficient evidentiary showing that the tribe in question has achieved federal recognition.  *See Maggi*, 598 F.3d at 1080.

In analogizing federal recognition to territorial jurisdiction, the dissent bases its disagreement, in part, on an "overriding practical consideration."  Dissent at 33; *see* Dissent Part II.  Although a practical consideration should not trump adherence to our case law, we nonetheless pause to address it.  The dissent argues that, historically, determination of federal recognition of an Indian tribe "involved review of source materials that judges are better suited than juries to evaluate," such as treaties, statutes and executive orders.  Dissent at 33–35.  After reviewing this historical context, the dissent concludes, "[t]he fact that the source materials for resolving the issue of federal recognition have until recently been legal texts explains why there is no historical support for submitting that issue to the jury."  Dissent at 35.  The dissent

is correct that *until recently* the determination of federal recognition may have involved some manner of source material interpretation. As we noted in *LaPier*, however, the process for determining federal recognition fundamentally changed in 1978; and the dissent fails to recognize that the entire body of case law regarding Indian status at issue here was developed against this modern legislative backdrop. As we noted above, in *LaPier* we looked to the BIA's "comprehensive list" and found that "[a]bsent evidence of its incompleteness," the list was the "best source" for determining federal recognition. 986 F.2d at 305. The dissent offers no evidence of incompleteness, nor is the dissent's citation to other statutory provisions persuasive, as each congressional act is incorporated into the BIA's list. *See* Dissent at 36 (citing 25 U.S.C. §§ 566, 712a, 1300j, 1300b-11). Thus, even this "practical" concern seems merely speculative.[14]

We draw support for our conclusion that the government failed to meet its burden of proof here from *United States v. James*, 987 F.2d 648 (9th Cir. 1993). In that case, the

---

[14] The Tenth Circuit has taken a similar position with respect to the judicial role in determining federal recognition. "In 1978 the Department of Interior promulgated regulations establishing 'procedures for establishing that an American Indian group exists as an Indian tribe.'" *W. Shoshone Bus. Council For & on Behalf of W. Shoshone Tribe of Duck Valley Reservation v. Babbitt*, 1 F.3d 1052, 1056–57 (10th Cir. 1993) (quoting 25 C.F.R. pt. 83). In analyzing whether a tribe was federally recognized, the Tenth Circuit reviewed, much like the dissent, the history of federal recognition and held that "the limited circumstances under which ad hoc judicial determinations of recognition were appropriate have been eclipsed by federal regulation." *Id*. at 1056 (referring to the express purpose of 25 C.F.R. § 83.2 to determine which tribes are federally recognized and holding that "the Tribe's absence from this list is dispositive").

defendant was convicted of bank robbery in violation of 18 U.S.C. § 2113(a). The government neglected to introduce evidence that the banks it accused the defendant of robbing were insured by the Federal Deposit Insurance Corporation ("FDIC"), though proof of FDIC insurance is an element of the charged offense. *Id.* at 649. At trial, the prosecutor alerted the district court that the parties were planning to enter into a stipulation that "ha[d] to do with the FDIC aspect of the case," but no such stipulation was ever read to the jury. *Id.* We reversed and held that there was insufficient evidence to support the defendant's conviction, reasoning that:

> [T]here was no evidence before the jury at all on whether the banks were insured by the FDIC. The bank employees who testified did not testify as to the FDIC status of the banks, and the stipulation concerning the "FDIC aspect" of the case was not read to the jury or received into evidence. Without any evidence on the FDIC status of the bank, no rational jury could have found beyond a reasonable doubt that the banks were insured by the FDIC.

*Id.* at 650 (citation omitted).

Here, like in *James*, because the government presented no evidence to the jury that Zepeda's bloodline derived from a federally recognized tribe, the jury lacked the requisite foundation to find beyond a reasonable doubt that the Pima or Tohono O'Odham tribes are federally recognized. Accordingly, we conclude that evidence of federal

recognition sufficient to sustain Zepeda's conviction on counts 2 through 9 of the indictment was lacking.[15]

---

[15] The government's reliance on *United States v. Johnson*, 680 F.3d 1140 (9th Cir. 2012) is misplaced. In that case, the defendant was convicted of two counts of making a false statement on federal "Form 4473" respecting information required to be kept by a federally licensed firearms dealer, in violation of 18 U.S.C. § 924(a)(1)(A). *Id.* at 1142. The defendant argued on appeal that the district court erred by deciding as a matter of law, rather than submitting to the jury, the question of whether the "information required by law to be kept by federally licensed firearms dealers" included identification of the actual buyer on Form 4473. *Id.* at 1146. The court noted that "Title 18 U.S.C. § 922(b)(5) directs licensed dealers to maintain records containing 'the name, age, and place of residence' of all individual buyers," that "Title 18 U.S.C. § 923(g)(1)(A) states that licensed dealers must maintain 'such records of . . . sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe,'" and that the Attorney General had promulgated regulations regarding the required contents of Form 4473. *Id.* at 1147. The court therefore concluded that "[t]he question whether the information on Form 4473 satisfied the requirements of § 924(a)(1)(A) was . . . entirely a matter of law, which the district court correctly resolved." *Id.* (citing *United States v. Cabaccang*, 332 F.3d 622, 624–25 (9th Cir. 2003) (en banc) ("The construction or interpretation of a statute is a question of law . . . .") (additional citation omitted)).

This case is readily distinguishable. The required contents of federal "Form 4473" is a question purely of statutory interpretation. By contrast, though the requirements of federal recognition are statutorily defined, the Bureau of Indian Affairs must make this determination in the first instance, subject to judicial review under the Administrative Procedure Act. *See* 25 C.F.R. §§ 83.1–83.13; *Greene v. Babbitt*, 64 F.3d 1266, 1271-75 (9th Cir. 1995). Whether the Bureau of Indian Affairs has recognized a particular tribe is a factual question, and must, therefore, be proved to a jury.

We therefore turn to the government's request that we take judicial notice of the Bureau of Indian Affairs's list of federally recognized tribes in 2008 and 2010.

**b.**

The government is correct, as a general matter, that the Bureau of Indian Affairs's list of federally recognized tribes is a proper subject of judicial notice, even on appeal. The fact of federal recognition is "capable of accurate and ready determination," the Federal Register is a "source[] whose accuracy cannot reasonably be questioned," and a court may take judicial notice "at any stage of the proceeding." Fed. R. Evid. 201(b)(2), (d); *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir. 1995), *rev'd on other grounds*, 520 U.S. 548 (1997) ("Rule 201 provides for judicial notice of adjudicative facts that are, *inter alia*, 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Such '[j]udicial notice may be taken at any stage of the proceeding,' including on appeal . . . .") (citations omitted).

However, Rule 201 further provides that, "[i]n a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(f). In other words, judicially-noticed facts are insufficient to meet the government's burden of proof beyond a reasonable doubt unless and until they are accepted by the jury as conclusive. Accordingly, we have recognized that, "[f]or a court . . . to take judicial notice of an adjudicative fact after a jury's discharge in a criminal case would cast the court in the role of a fact-finder and violate defendant's Sixth Amendment right to trial by jury." *United States v. Dior*,

671 F.2d 351, 358 n. 11 (9th Cir. 1982).[16]   Indeed, "just because a fact may be generally known does not mean that the need to introduce evidence of that fact, or to request that it be judicially noticed, is dispensed with automatically.  As Mr. Dooley once said: 'Nuth'n walks itself into evidence.'" *Id.*

   Here, although it would have been proper for the government to request the district court to take judicial notice of the fact of the Gila River Indian Community of the Gila River Indian Reservation, Arizona[17] and Tohono O'Odham

---

[16] The court in *Dior* cited the Sixth Circuit's discussion of this point in *United States v. Jones*, 580 F.2d 219 (6th Cir. 1978), with approval.  In *Jones*, the Sixth Circuit addressed an appellate court's power under former Fed. R. Evid. 201(f) to take judicial notice "at any stage of the proceeding."  The court held that it could not take judicial notice on appeal of the fact that Southern Central Bell Telephone Company was a common carrier that provided facilities for the transmission of interstate or foreign communications.  *Id.* at 224.  The court noted that Rule 201 provides that the jury in a criminal case may, but is not required to, accept as conclusive any fact judicially noticed.  *Id.* at 223.  Therefore, the court reasoned, for an appellate court to take judicial notice of an adjudicative fact in a criminal case would frustrate the policies Congress sought to achieve in providing that a jury is not required to accept as conclusive a judicially noticed fact.  *Id.*  The *Dior* court agreed, adding that "[t]hese policies are to preserve the jury's traditional prerogative, in a criminal case, to ignore even uncontroverted facts in reaching a verdict and to prevent the trial court from violating the spirit of the Sixth Amendment right to counsel by directing a partial verdict as to facts."  *Dior*, 671 F.2d at 358 n. 11 (citing *Jones*, 580 F.2d at 223-24; "Note of Committee of the Judiciary" H.R. No. 93-650, 93d Cong., 1st Sess. 6-7, reprinted in (1974) U.S. Code Cong. & Admin. News 7051, 7075, 7080).  *Dior* remains good law and we are bound to follow its persuasive analysis.

[17] We note that because we are only concerned with the first prong of the *Bruce* test, the status of the Gila River is not actually relevant to our decision.

Nation of Arizona tribes' federal recognition as part of its case in chief, the government made no such request and the district court did not do so.[18]  Rather, the jury found that Zepeda was an Indian pursuant to § 1153 in the absence of any proof that Zepeda's bloodline derived from a federally recognized tribe.  We are not at liberty to displace the role of the jury and to make this factual determination on its behalf.  *See James*, 987 F.2d at 651 (rejecting the government's

---

[18] The dissent would have this court find as a matter of law that the "Tohono O'odham Nation of Arizona" and the "Gila River Indian Community of the Gila River Indian Reservation, Arizona" are federally recognized tribes.  Dissent at 42.  Even were this court permitted to do so—which we are not—we would still be compelled to reverse Zepeda's conviction on sufficiency grounds.  Analyzing only the first prong of the *Bruce* test, there would remain no evidence in the record that the "Tohono O'Odham" referenced in Zepeda's Tribal Enrollment Certificate refers to the federally recognized "Tohono O'odham Nation of Arizona."  The dissent elides this point and claims that "Zepeda has not contested the federally recognized status" of the Gila River Indian Community nor the Tohono O'odham Nation of Arizona.  Dissent at 42.  To the point, Zepeda vigorously argues that the name "Tohono O'Odham" is *not* on the BIA list and that the "appellation 'Tohono O'Odham' describes the *collective* Tohono O'Odham population, a substantial portion of which has always resided in the Sonoran Desert of northwest Mexico. The BIA specifically lists as federally recognized *only* the 'Tohono O'odham Nation of Arizona,' and *not* members of the collective 'Tohono O'Odham' tribe, 'wherever residing' that Zepeda's certificate apparently describes. . . . [T]he Certificate's recitation of 'Tohono O'Odham' must include the Tohono O'Odhams *of Mexico*, who cannot be the 'Tohono O'odham Nation of Arizona' . . . ."

Even under the dissent's law-fact dichotomy, the government still bore the burden of proving beyond a reasonable doubt the fact that Zepeda's blood derived from the federally recognized "Tohono O'odham Nation of Arizona."  As Zepeda's argument indicates, this is a factual inquiry and one that was not decided by the jury in this case—nor could it have been as it was never presented to the jury.

argument that a rational juror could have found the defendant guilty of the federal crime of bank robbery beyond a reasonable doubt in light of the fact that "the district court could have taken judicial notice of the FDIC status of the bank" because "it was not asked to take judicial notice of the FDIC status of the bank and did not do so. Nor was any judicially noticed fact presented to the jury").

Because "there is no evidence that [Zepeda] has any blood from a federally recognized Indian tribe," *Maggi*, 598 F.3d at 1075, we conclude that no rational juror could have found Zepeda guilty beyond a reasonable doubt of counts 2 through 9 of the indictment, the offenses predicated on § 1153, and his convictions must be vacated.

## IV.

In sum, we hold that the Tribal Enrollment Certificate was insufficient to establish that Zepeda is an Indian for the purposes of federal jurisdiction under § 1153 because the government introduced no evidence that Zepeda's bloodline is derived from a federally recognized tribe. We do not suggest, in so holding, that a Tribal Enrollment Certificate may *never* be sufficient to meet the government's burden under the first prong of the *Bruce* test. Of course, future cases may present circumstances in which the Certificate itself reflects this information. But that is not the case before us today.

Because we hold that the government introduced insufficient evidence under the first prong of the *Bruce* test, we need not consider whether the Tribal Enrollment Certificate alone was sufficient to carry the government's

burden as to the second prong.  As to that issue, we express no opinion.

For the above reasons, Zepeda's convictions under § 1153, in counts 2 through 9 of the indictment, are REVERSED. Zepeda's conviction for conspiracy in violation of 18 U.S.C. § 371 is unaffected by this disposition.[19]  *See Begay*, 42 F.3d at 499 ("Section 371 is a federal criminal statute of nationwide applicability, and therefore applies equally to everyone everywhere within the United States, including Indians in Indian country.").

**REVERSED in part and REMANDED for resentencing.**

WATFORD, Circuit Judge, dissenting:

I part company with the majority on a single issue, but that issue is a game-changer in this case.  We all agree that federal courts have subject matter jurisdiction under 18 U.S.C. § 1153 only if the defendant is an "Indian," which means the defendant must have both a blood connection and sufficient non-racial ties to an Indian tribe that has been recognized by the federal government.  Federal recognition of an Indian tribe is a formal political act that "permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation,' and imposes on the government a

---

[19] Zepeda raises numerous additional issues on appeal that are relevant to his conspiracy conviction.  We address those issues in a separate memorandum disposition filed concurrently with this opinion.

fiduciary trust relationship to the tribe and its members." H.R. Rep. 103-781, at 2 (1994) (footnote omitted). The majority holds that the existence of this government-to-government relationship is a factual determination for the jury to make. I would hold that it is a question of law for the court to resolve.

## I

We have addressed this same judge-or-jury issue in a variety of contexts, one of which is particularly analogous here. A jurisdictional element of various federal crimes requires proof that the offense was committed within "Indian country." *See, e.g.*, 18 U.S.C. §§ 1152, 1153; *see also* 18 U.S.C. § 1151 (defining "Indian country"). We have held that this element has both a factual and a legal component: The jury decides as a factual matter where the crime occurred; the court decides as a matter of law whether that location is within Indian country. *United States v. Sohappy*, 770 F.2d 816, 822 & n.6 (9th Cir. 1985); *United States v. Gipe*, 672 F.2d 777, 779 (9th Cir. 1982) (per curiam). The Second, Eighth, and Tenth Circuits have adopted the same rule. *See United States v. Roberts*, 185 F.3d 1125, 1138–39 (10th Cir. 1999); *United States v. Cook*, 922 F.3d 1026, 1031 (2d Cir. 1991); *United States v. Deon*, 656 F.2d 354, 356–57 (8th Cir. 1981). Thus, at trial, the court decides the "jurisdictional status" of the place where the alleged crime occurred, "and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." *Roberts*, 185 F.3d at 1139; *see also* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW § 9.02[1][b], p. 732 (2005 ed.) (hereafter COHEN).

The same rule applies to statutes requiring proof that the offense was committed within the "special maritime and territorial jurisdiction of the United States." *See, e.g.*, 18 U.S.C. §§ 113, 1111; *see also* 18 U.S.C. § 7 (defining the phrase). In that context, too, the jury decides as a factual matter where the crime occurred, but the court determines as a matter of law whether that location is within the special maritime and territorial jurisdiction of the United States. *See United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993); *accord United States v. Hernandez-Fundora*, 58 F.3d 802, 809–12 (2d Cir. 1995); *United States v. Jones*, 480 F.2d 1135, 1138–39 (2d Cir. 1973).

Like the Indian country and territorial jurisdiction elements at issue in these cases, the Indian status element of § 1153 has both a factual and a legal component. The factual component, to be decided by the jury, is derived from the two-prong test we established in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), which requires proof that the defendant has (1) a blood connection to an Indian tribe, and (2) sufficient non-racial ties to an Indian tribe. *Id.* at 1223–24. The legal component, to be resolved by the court, is whether the Indian tribe at issue has been recognized by the federal government.

Federal recognition should be classified as a legal issue because it stands doctrinally on the same footing as the determination that a particular location is within Indian country or the special maritime and territorial jurisdiction of the United States. Both determinations relate to a fixed legal status that does not change from case to case—the status of a particular location relative to the federal government in one instance, the status of the defendant's tribe relative to the federal government in the other. And both determinations

play the same role in their respective spheres: They vest federal courts with subject matter jurisdiction. Federal recognition of an Indian tribe establishes a "special relationship" between the federal government and the tribe, which "subject[s] the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country." *LaPier v. McCormick*, 986 F.2d 303, 305 (9th Cir. 1993). Absent that special relationship between the federal government and the defendant's tribe, federal courts lack subject matter jurisdiction under § 1153. *Id.*; *United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974). Thus, just as the federal government must exercise jurisdiction over the place where the crime occurred for subject matter jurisdiction to vest under certain statutes, so too the federal government must recognize the defendant's Indian tribe before subject matter jurisdiction can vest under § 1153.

The majority offers no principled basis for holding that the jurisdictional status of the defendant's Indian tribe is a factual issue in § 1153 cases, when the jurisdictional status of a location is a legal issue in the Indian country and territorial jurisdiction cases. The two determinations seem functionally identical to me. I would apply the same rule to both and hold that the jurisdictional status of the defendant's tribe should be determined by the court rather than the jury.

## II

Beyond the doctrinal parallels, an overriding practical consideration supports treating the jurisdictional status of a location and the jurisdictional status of the defendant's Indian tribe as questions of law: Historically, both determinations have involved review of source materials that judges are better suited than juries to evaluate. *See Miller v. Fenton*,

474 U.S. 104, 114 (1985) ("[T]he fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.").

Take the Indian country determination as an example. Determining whether a particular location is within Indian country typically involves construing the effect of treaties, statutes, and executive orders with respect to the geographic area at issue. *See, e.g.*, *United States v. John*, 437 U.S. 634, 638–54 (1978) (interpreting treaties and congressional enactments to determine whether lands designated as a reservation for the Choctaw Indians were within Indian country); *United States v. Soldana*, 246 U.S. 530, 531–33 (1918) (construing federal statutes to determine whether a railroad right-of-way remained within the Crow Indian Reservation); *Donnelly v. United States*, 228 U.S. 243, 259–69 (1913) (surveying a wide range of executive orders and legislative enactments to determine whether the bed of the Klamath River was within the Hoopa Valley Reservation). We have rightly deemed judges rather than juries better suited to the task of interpreting the meaning and effect of treaties, statutes, and executive orders. *See Sohappy*, 770 F.2d at 822 n.6 ("The issue of what constitutes Indian country is properly a matter for the judge and not the jury."). That allocation of responsibility is consistent with the Supreme Court's general observation that "[t]he construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996).

For most of our Nation's history, determining a tribe's federally recognized status also involved interpretation of

treaties, statutes, and executive orders. From the founding until 1871, the federal government recognized Indian tribes primarily by negotiating treaties with individual tribes. *United States v. Lara*, 541 U.S. 193, 201 (2004); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 57 (2d Cir. 1994); COHEN § 3.02[4], p. 140. After Congress banned treaty making with tribes in 1871, *see* 25 U.S.C. § 71, the Executive Branch continued to recognize tribes by negotiating bilateral agreements that Congress then ratified by statute. *Antoine v. Washington*, 420 U.S. 194, 203–04 (1975); COHEN § 5.01[3], p. 395. Since passage of the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*, tribes have been recognized primarily through administrative action by the Bureau of Indian Affairs (BIA), initially on an ad hoc basis and then, beginning in 1978, through formal administrative procedures. *See Golden Hill Paugussett Tribe*, 39 F.3d at 57; 25 C.F.R. pt. 83. "Consequently, federal courts historically played a significant role in determining federally recognized tribal existence, relying heavily on the history of dealings by the political branches through treaties, statutes, executive orders, or agreements recognizing the tribe in question." COHEN § 3.02[1], p. 136.

The fact that the source materials for resolving the issue of federal recognition have until recently been legal texts explains why there is no historical support for submitting that issue to the jury. Indeed, the majority fails to cite a single instance in which a jury has been asked to decide whether the federal government has recognized an Indian tribe. As will be shown below, our cases have instead treated the issue (at least implicitly) as one of law for the court to resolve.

The majority notes that today the task of determining which tribes have been federally recognized is much simpler

because the BIA periodically publishes a list of such tribes. *See* 25 C.F.R. § 83.5(a) (list to be updated and published every three years). But the existence of this list, which first appeared in 1979, *see LaPier*, 986 F.2d at 305, cannot transform what had been a legal issue for the court into a factual question for the jury. The list merely reflects actions Congress and the Executive Branch have previously taken to confer federal recognition on the listed tribes. If tomorrow the Executive Branch created a list of all locations that are within "Indian country," or within the "special maritime and territorial jurisdiction of the United States," would we hold that the jurisdictional status of the place where the crime occurred is now a factual question that must be submitted to the jury? I cannot see any reason why we would.

In any event, consulting the BIA's list will not always end the federal recognition inquiry. *See* COHEN § 3.02[5], p. 143 ("Tribes not included on the list may be able to establish their status as federally recognized through other means, however."). Congress retains the authority to recognize new tribes by statute and to restore the status of previously terminated tribes without any action by the BIA, a power it has exercised a number of times since 1979. *See, e.g.*, 25 U.S.C. §§ 566, 712a, 1300j, 1300b-11; *see also* COHEN § 3.02[5], p. 144 & n.57; *id.* § 3.02[8][c], p. 168 & n.225. In addition, Congress has declared that it alone has the authority to terminate a tribe's federally recognized status. *See* Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), 108 Stat. 4791, 4791 (1994); COHEN § 3.02[8][a], p. 164. That means the BIA's failure to include a recognized tribe on the list, whether deliberately or through oversight, would not strip a tribe of its federally recognized status unless Congress had spoken through express legislative action. *See* COHEN § 3.02[8][a], p. 164 & n.196. Even today,

then, circumstances remain in which determining a tribe's federally recognized status might entail interpreting the meaning and effect of congressional enactments. As noted, that is not a task we typically assign to juries.

## III

The cases on which the majority relies provide no support for its holding. We did not address whether judge or jury should resolve the issue of federal recognition in *United States v. Maggi*, 598 F.3d 1073 (9th Cir. 2010), *United States v. Cruz*, 554 F.3d 840 (9th Cir. 2009), *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005), *LaPier v. McCormick*, 986 F.2d 303 (9th Cir. 1993), or *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974). Those cases merely established that a defendant's *Indian status* is an element of the offense that must be proved to the jury beyond a reasonable doubt. *See, e.g.*, *Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845; *Bruce*, 394 F.3d at 1229. No one disputes that here. The only question is whether one component of that element—the federally recognized status of the tribe at issue—must be decided by the jury. On that score, the Indian country and territorial jurisdiction cases discussed above are indistinguishable. There, too, the jury must find beyond a reasonable doubt that the offense occurred within Indian country, or within the special maritime and territorial jurisdiction of the United States. Nonetheless, we have held that one component of that element—the jurisdictional status of the place where the crime occurred—is a legal question for the court to resolve. *See Warren*, 984 F.2d at 327; *Sohappy*, 770 F.2d at 822 & n.6; *Gipe*, 672 F.2d at 779.

The majority is mistaken in suggesting that *Gipe* supports its holding. *Gipe* reaffirms the rule from the territorial

jurisdiction cases on which I rely: "[W]here the exercise of federal jurisdiction over a specific geographic area is necessary to vest jurisdiction in federal court," "the court may determine *as a matter of law* the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the trier of fact." 672 F.2d at 779 (emphasis added). That rule applies here because federal recognition of the defendant's Indian tribe is necessary to vest jurisdiction in federal court under 18 U.S.C. § 1153. *See LaPier*, 986 F.2d at 305; *Heath*, 509 F.2d at 19. The rule the majority quotes from *Gipe* as supportive of its holding—"where the 'locus of the act . . . constitutes an element of the crime . . . the prosecution should bear the burden of proof as to the status of the site' beyond a reasonable doubt"—does not apply to § 1153. Maj. Op. at 22. It applies only when the status of the site is an element of the offense but is *not* jurisdictional, as is true under 18 U.S.C. § 1156, the statute at issue in *Gipe*. *See* 672 F.2d at 779; *cf.* Maj. Op. at 9 (acknowledging that Indian status is a jurisdictional element under § 1153).

In the cases cited by the majority in which a tribe's federally recognized status was actually at issue, we never suggested that federal recognition was a factual question. In *Heath*, we reversed the defendant's conviction under 18 U.S.C. § 1153 because she was a member of a tribe whose federally recognized status had been terminated by Congress. *Heath*, 506 F.2d at 19. That issue had not been addressed below because Heath had stipulated at trial that she was an Indian. *Id.* at 17–18. But federal recognition turned on construction of a statute, the Klamath Termination Act, 25 U.S.C. § 564 *et seq.*, and we resolved the issue ourselves. We did not treat the tribe's status as a factual question to be

decided by the district court in the first instance, or by the jury at a new trial.

In *LaPier*, we rejected a state habeas petitioner's contention that, because he was an Indian, the state courts lacked jurisdiction over his offense. We rejected that contention because the petitioner's tribe was not federally recognized. *LaPier*, 986 F.2d at 305–06. Although the district court had not addressed the issue, we decided it ourselves by consulting the list of federally recognized tribes prepared by the BIA. *See id.* We held that, "[a]bsent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdictional inquiry." *Id.* at 305. Had we regarded a tribe's federally recognized status as a factual issue, we presumably would have remanded for resolution of that issue in the first instance by the district court.

Finally, in *Maggi* we reversed a defendant's conviction under 18 U.S.C. § 1153 because the defendant's tribe had not been recognized by the federal government. Our discussion of that issue gave no hint that we regarded federal recognition as a factual question. Contrary to the majority's suggestion (Maj. Op. at 17 n.11), we did not speak of the "evidence" of federal recognition having been insufficient. Instead, we simply declared that the tribe at issue "is not recognized by the federal government, although there is a longstanding petition for recognition pending." *Maggi*, 598 F.3d at 1076. That declaration is as consistent with this court having resolved the issue as a matter of law as anything else.

The majority also relies on *United States v. James*, 987 F.2d 648 (9th Cir. 1993), where we reversed a

defendant's bank robbery conviction because the government failed to introduce any evidence establishing that the bank's deposits were insured by the Federal Deposit Insurance Corporation (FDIC).     That decision seems readily distinguishable to me, since proof of FDIC insurance generally turns on review of historical facts, a responsibility juries have traditionally been assigned. *See, e.g.*, *United States v. Washburn*, 758 F.2d 1339, 1339–40 (9th Cir. 1985) (per curiam) (FDIC insurance proved by copy of bank's original 1976 FDIC certificate and testimony that bank personnel regularly checked to make sure the certificate was still current); *United States v. Ballard*, 418 F.2d 325, 327 (9th Cir. 1969) (FDIC insurance proved by invoice from the FDIC and cancelled check from the bank).  But even if *James* is in tension with the Indian country and territorial jurisdiction cases discussed above, those cases involve a far more analogous jurisdictional element than FDIC insurance.  Faced with the choice of following *James* or the more closely on point decisions in *Warren*, *Sohappy*, and *Gipe* (among others), I have no difficulty concluding that the latter cases provide a sounder source of guidance.

## IV

It follows that we should adopt here the same rule we apply in the Indian country and territorial jurisdiction cases, under which the court resolves the legal component of the jurisdictional element and submits the factual component to the jury. *See, e.g.*, *Jones*, 480 F.2d at 1139 ("[T]he court's instruction correctly left the factual element – the locus of the crime – to the jury, while reserving the question of law – whether the federal government had accepted jurisdiction – to itself.").  When a defendant's status as an Indian under 18 U.S.C. § 1153 is contested at trial, the court should first

determine, as a matter of law, that the defendant's Indian tribe is federally recognized. (If the tribe is *not* federally recognized, of course, the court lacks subject matter jurisdiction. *See Maggi*, 598 F.3d at 1078; *Heath*, 506 F.2d at 19.) The court should then instruct the jury to decide, as a factual matter, whether the defendant has a blood connection and sufficient non-racial ties to that federally recognized tribe, as required by the two-prong test we established in *Bruce*, 394 F.3d at 1223–24.

The jury in this case did not receive such an instruction, and effectively received no instructions at all on the Indian status element. (The district court merely told the jury that in order to convict the jury had to find "the defendant is an Indian.") This was error. But because Zepeda did not object to the deficient instruction on Indian status, we review only for plain error, which requires (among other things) an error affecting Zepeda's substantial rights. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731–32 (1993). Under the plain error test, even when the court's instructions omit an element of the offense altogether, reversal does not follow if uncontroverted evidence supporting the element was introduced at trial. *United States v. Smith*, 282 F.3d 758, 766–67 (9th Cir. 2002).

No plain error occurred here. At trial, the government introduced uncontroverted evidence satisfying the factual component of the Indian status element: Zepeda's certificate of tribal enrollment in the Gila River Indian Community. That certificate established: (1) that Zepeda has blood ancestry of "1/4 Tohono O'Odham" (thus satisfying the first prong of the *Bruce* test); and (2) that he was an enrolled member of the Gila River Indian Community (thus satisfying the second prong of the *Bruce* test). *See, e.g.*, *United States*

*v. Torres*, 733 F.2d 449, 455 (7th Cir. 1984) ("[U]ncontradicted evidence of tribal enrollment and a degree of Indian blood constitutes adequate proof that one is an Indian for purposes of 18 U.S.C. § 1153."); *United States v. Dodge*, 538 F.2d 770, 786–87 (8th Cir. 1976) (enrollment and 1/4 Indian blood sufficient); *United States v. Lossiah*, 537 F.2d 1250, 1251 (4th Cir. 1976) (enrollment and 3/4 Indian blood sufficient).

The district court did not determine whether the tribes at issue here are recognized by the federal government. But they are, and they were so at the time of trial. The Tohono O'odham Nation of Arizona and the Gila River Indian Community of the Gila River Indian Reservation, Arizona, both appear on the BIA's list of federally recognized tribes. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 74 Fed. Reg. 40,218, 40,220, 40,221 (Aug. 11, 2009); *see also Gila River Indian Cmty. v. United States*, 697 F.3d 886, 889 (9th Cir. 2012). Zepeda has not contested the federally recognized status of either tribe.

As the majority notes (Maj. Op. at 28 n.18), Zepeda does contest whether his "1/4 Tohono O'Odham" blood is from the Tohono O'odham Nation of Arizona. That argument, however, has nothing to do with the issue that divides the panel. As I have explained, the court must decide as a legal matter whether a particular tribe has been federally recognized, but the jury still determines as a factual matter whether the defendant has a sufficient blood connection to that tribe to satisfy the first prong of the *Bruce* test. There is no sufficiency-of-the-evidence problem with respect to that factual issue here: Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a rational jury could certainly infer that the

reference in Zepeda's tribal enrollment certificate to "1/4 Tohono O'Odham" is a reference to the federally recognized Tohono O'odham Nation of Arizona, particularly since Zepeda testified that he has lived his entire life in Arizona. Thus, even if the majority is correct to credit Zepeda's argument—concocted for the first time after oral argument—that his "1/4 Tohono O'Odham" blood might be derived from Tohono O'odhams living in Mexico, the majority errs by granting Zepeda a judgment of acquittal rather than reversing and remanding for a new trial. *See United States v. Affinito*, 873 F.2d 1261, 1264–65 (9th Cir. 1989).

But the majority is wrong to credit Zepeda's argument in any event, because the Tohono O'odham Nation of Arizona has historically encompassed, from the outset of federal recognition, members of the tribe residing in Mexico. "The recognition of the Nation by the federal government [in 1937] followed a census conducted on both sides of the border in which the United States affirmed the Nation's definition of membership based on O'odham blood. Members were included in a 'base roll,' a document that formed the basis of recognition for their Nation by the United States based on their blood, not on their country of citizenship, residency, or birth." Courtney E. Ozer, *Make It Right: The Case for Granting Tohono O'odham Nation Members U.S. Citizenship*, 16 Geo. Immigr. L.J. 705, 709 (2002) (footnote omitted).

The only question that remains is whether reversal is required because the district court failed to make the required legal ruling on the tribes' federally recognized status. We dealt with a similar situation in *United States v. Warren*, 984 F.2d 325 (9th Cir. 1993). There, the defendant was charged with a crime requiring commission of the offense

within the special maritime and territorial jurisdiction of the United States. *Id.* at 327. The government alleged that the defendant committed the offense on an army base called Schofield Barracks. The district court failed to determine, as a matter of law, that Schofield Barracks was within the special territorial jurisdiction of the United States, and further failed to instruct the jury that it had to find, as a factual matter, that the crime was committed at Schofield Barracks. *Id.* We held that the district court's wholesale failure to instruct the jury on the jurisdictional element was not plain error. As a factual matter, the government introduced uncontroverted evidence that the defendant committed the crime at Schofield Barracks. And, as a legal matter, we held that an army base *is* within the special territorial jurisdiction of the United States. *Id.* at 328.

Our decision in *Warren* confirms that the district court's error in this case did not affect Zepeda's substantial rights. Uncontroverted evidence established as a factual matter that Zepeda has a blood connection to one tribe and sufficient non-racial ties to another, satisfying both prongs of the *Bruce* test. And, as a matter of law, both tribes *are* federally recognized. That should be the beginning and end of our analysis here. I would affirm Zepeda's convictions and therefore must respectfully dissent.